**UNITED STATES OF AMERICA,**
**Plaintiff–Appellee,**

v.

**Herbert G. EVANS, Jr., Defendant–**
**Appellant.**

**No. 04–4230.**

United States Court of Appeals,
Fourth Circuit.

Argued: Dec. 3, 2004.

Decided: April 12, 2005.

**ARGUED**: Monroe Jamison, Jr., Abingdon, Virginia, for Appellant. Steven Randall Ramseyer, Assistant United States Attorney, Office of the United States Attorney, Abingdon, Virginia, for Appellee. **ON BRIEF**: John L. Brownlee, United States Attorney, Roanoke, Virginia, for Appellee.

Before WILLIAMS and MICHAEL, Circuit Judges, and Henry F. FLOYD, United States District Judge for the District of South Carolina, sitting by designation.

Vacated and remanded with instructions by published opinion. Judge WILLIAMS wrote the opinion, in which Judge MICHAEL and Judge FLOYD joined.

## OPINION

WILLIAMS, Circuit Judge:

Herbert G. Evans, Jr. was indicted on federal charges of assaulting a United States agricultural employee and threatening to murder a United States judge. The district court found that Evans was incompetent to stand trial because of his paranoid schizophrenia. Evans refused treatment, and the Government moved to medicate him against his will to restore his competence so it could try him on the charges.

In *Sell v. United States*, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003), the Supreme Court held that the government may involuntarily medicate a defendant for the purpose of rendering him competent to stand trial if (1) the government has an "important" interest in trying him, (2) involuntary medication will "significantly further" that interest, (3) involuntary medication is "necessary" to further the government's interest, and (4) administration of the drugs is "medically appropriate." *Id.* at 2184–85. Applying this four-part test, the district court granted the Government's motion, and Evans now appeals.

For the reasons explained below, we hold that the district court correctly found that the Government's interest in prosecuting Evans is an "important" one. Evans is facing a serious charge with a statutory maximum punishment of ten years for threatening to murder a United States judge, and there are no special circumstances that undermine the Government's interest. We also hold that the district court erroneously concluded that the Government demonstrated that involuntary medication would "significantly further" its prosecutorial interest and was "medically appropriate." The Government failed to explain what specific medications it planned to give Evans and failed to examine these two factors with sufficient particularity. We therefore vacate the district court's order and remand for further proceedings with instructions to allow the parties to supplement the record in a manner consistent with this opinion.

## I. Factual Background

On November 4, 2002, Evans, then a 74-year-old military veteran, entered the Rural Development Agency (RDA) office in Wytheville, Virginia to complain about a late-payment notice he received on a housing loan. The RDA, which is an arm of the United States Department of Agriculture (USDA), administered the loan. According to the RDA agent with whom Evans spoke, Evans became "extremely angry and loud," (J.A. at 12), and claimed that the late notices were evidence that the government was "out to get him." (J.A. at 11.) He told the agent that the "United States was heading toward communism" and that he had three crosses in his yard—"one for Ruby Ridge, one for

Waco, and one for Oklahoma City." (J.A. at 11.) He said that he "had lived his life, and would not mind taking a few with [him]." (J.A. at 11.) Evans then stated that "he was experienced ... with chemical and biological warfare and ... the [RDA should] get the situation straightened out with his loan [because] ... they didn't [know what terrorism was] until they saw what he could do." (J.A. at 11–12.)

On November 14, 2002, Evans was arrested on a misdemeanor charge of "assault[ing], resist[ing], or [impeding] [an employee of the USDA]" under 18 U.S.C.A. § 111(a)(1) (West Supp.2004).[1] On November 19, 2002, a magistrate judge held Evans's detention hearing. At the hearing, the magistrate judge granted the Government's motion for a psychiatric examination to determine Evans's competency to stand trial. Evans was transferred to the Federal Correctional Institution in Butner, N.C. (Butner), where medical staff evaluated him and prepared a competency report. Based on the report, the magistrate judge determined, on March 24, 2003, that Evans was incompetent to stand trial. The magistrate judge recommitted Evans to Butner for the purpose of evaluating whether Evans could attain competency in the foreseeable future.

At Butner, Evans refused antipsychotic medication, and the Butner staff set in motion administrative proceedings to determine the propriety of medicating him against his will. Before these proceedings concluded, the United States Supreme Court decided *Sell v. United States,* 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003), which clarified the legal standard for administering involuntary medication to render a defendant competent to stand trial. On June 24, 2003, in response to *Sell,* the Government moved to allow the Butner staff to medicate Evans against his will.

On October 31, 2003, the magistrate judge held an evidentiary hearing, during which she accepted into evidence several reports prepared at Butner—specifically, Evans's competency report and the Butner staff's evaluation of whether Evans should be involuntarily medicated (IM report)—and testimony and a report from Evans's witness, Dr. Margaret Robbins, a forensic psychiatrist, also evaluating whether Evans should be involuntarily medicated. The Butner reports, which detailed Evans's medical history, concluded that Evans had been suffering from paranoid schizophrenia since at least 1966 and had last been medicated for his condition in 1984. As relevant here, the IM report stated conclusorily that second-generation, or atypical antipsychotic medications, which were created in the 1990s, would be "substantially likely" to allow Evans to attain competency to stand trial. (J.A. at 315.) In addition, it stated summarily that such medication would be "substantially unlikely to have side effects that will interfere significantly with [Evans's] ability to assist counsel in conducting a defense." (J.A. at 315.) Finally, it concluded that involuntary medication would be "medically appropriate" for Evans. (J.A. at 316.)

Despite extolling the virtues of the atypical antipsychotic medications, the IM report never actually stated that the Butner staff proposed to give Evans such treatment; in fact, the report did not specify any type of medication the staff planned to give Evans. Moreover, the IM report contained little analysis explaining the rationale for its conclusions. In concluding that antipsychotic medication was "sub-

---

1. The statutory maximum penalty for a misdemeanor violation of § 111(a)(1) is one year imprisonment. 18 U.S.C.A. § 111(a) (West Supp.2004).

stantially likely" to restore Evans's competency, the report generally stated that such medication was "[t]he primary [way to treat] Schizophrenia." (J.A. at 315.) Likewise, in concluding that such treatment was "substantially unlikely" to produce significant side effects, the report stated that atypical antipsychotic medications "have a more favorable side effect profile for many patients who were previously treated with conventional antipsychotic medication," (J.A. at 315), and that the side effects produced by the atypical antipsychotic medication "are routinely managed by thousands of American psychiatrists in daily clinical practice, who assess the risks and benefits of any particular medication in treating their patients." (J.A. at 315.) Finally, it concluded that involuntary medication was "medically appropriate" because "the standard treatment of anyone with [Evans's] condition of Schizophrenia would involve the prescription of antipsychotic medication." (J.A. at 316.)

Dr. Robbins's opinion, which was based on her review of Evans's medical records and an interview with him that lasted one and a half hours, was that Evans's delusional beliefs were "fixed." (J.A. at 101.) She concluded that because Evans did not want to be medicated, the medicine might calm him down, but his core delusions were "impervious to medication." (J.A. at 101.) She also opined that "in order to really assess whether . . . there would be side effects, [it would] be necessary to know specific medications that were proposed for administration." (J.A. at 107.) Finally, she testified that if she were treating Evans, she would not medicate him, although she admitted that she was "not sure that [she had] seen anything in the record that would suggest that [treatment without medication] would be successful." (J.A. at 123.)

On December 1, 2003, the magistrate judge denied the Government's motion to medicate Evans against his will. The magistrate judge found that the Government's interest in bringing Evans to trial was not important enough to outweigh Evans's liberty interest in avoiding involuntary medication because the maximum penalty for violating § 111(a) was less than the time Evans already had been confined. The magistrate judge scheduled a hearing for January 23, 2004 to determine whether Evans was dangerous and should therefore continue to be confined. Evans was then sent to New River Valley Regional Jail in Dublin, Virginia, to await the hearing.

The hearing did not occur. Instead, on January 23, 2004, the Government filed a criminal complaint against Evans charging him with violating 18 U.S.C.A. § 115(a)(1)(B) (West 2000) for "threaten[ing] to murder a United States judge, with intent to retaliate against such judge, on account of the performance of official duties."[2] (J.A. at 167.) The affidavit submitted with the complaint alleged that, while incarcerated at New River Valley, Evans stated to fellow inmates that the magistrate judge was responsible for his continued incarceration, that "he [had] a good idea where [the magistrate judge] resides" and that "when he is released from prison he will find her, hunt her down, and get rid of her and her family." (J.A. at 169.) The magistrate judge recused herself from the case, and it was reassigned.

On March 5, 2004, the district court held a hearing wherein the Government re-

---

**2.** The statutory maximum penalty for violation of § 115(a)(1)(B) is 10 years. 18 U.S.C.A. § 115(b)(1)(4) (West Supp.2004).

newed its motion to involuntarily medicate Evans. On March 18, 2003, after reviewing the evidence submitted at the March 5, 2004 and October 31, 2003 hearings, and after receiving arguments of counsel, the district court issued an order authorizing the Government to medicate Evans against his will in order to render him competent to stand trial. The order observed that the facts had changed since the magistrate judge's order, in that the charge under § 115(a)(1)(B), a felony that carried with it a maximum imprisonment term of 10 years, made the Government's interest in bringing Evans to trial an important one. In addition, the district court credited the Butner reports over Dr. Robbins's because "the Butner staff ... had a much longer opportunity to observe and evaluate Evans, and their conclusions better correspond[ed] with Evans'[s] medical and social history," (J.A. at 240), and concluded that the Government's prosecutorial interest outweighed Evans's interest in not being involuntarily medicated.

The district court granted Evans's motion to stay execution of its order granting the motion for involuntary medication, and Evans timely appealed. We have jurisdiction over the appeal, *see Sell,* 123 S.Ct. at 2181–82, and, for the reasons that follow, we now vacate and remand with instructions.

## II. *Sell v. United States*

In *Sell,* the Supreme Court held that the government's interest in bringing a mentally incompetent defendant to trial can outweigh the defendant's liberty interest in being free from unwanted medi-

cation, such that the Due Process Clause will allow the government to medicate the defendant against his will. 123 S.Ct. at 2187. To comply with the Constitution, however, the government must first make a four-part showing. *See Riggins v. Nevada,* 504 U.S. 127, 135, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) (observing that the state bears the burden of proving that involuntary medication satisfies the Constitution). First, it must show that "important governmental interests are at stake." *Sell,* 123 S.Ct. at 2184 (emphasis omitted). An "important" governmental interest exists when the defendant is accused of a "serious" crime and "[s]pecial circumstances" do not undermine the government's interest in trying him for that crime. *Id.* Second, it must show that involuntary medication will "significantly further" the state's interest. *Id.* (emphasis omitted). In other words, it must show that the involuntary administration of the medication is both (a) "substantially likely to render the defendant competent to stand trial" and (b) "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Id.* at 2184–85. Third, it must show that involuntary medication is "necessary" to further its interests by showing that "any alternative, less intrusive treatments are unlikely to achieve substantially the same result." *Id.* at 2185 (emphasis omitted). Fourth, it must show that the administration of the drugs is "medically appropriate," or that it is in the defendant's "best medical interest in light of his medical condition." *Id.* (emphasis omitted).[3]

---

**3.** The Supreme Court has outlined different tests for when the government may involuntarily medicate an individual, depending on whether the medication is for purposes of prison control or prisoner health on the one hand, *see Washington v. Harper,* 494 U.S. 494

U.S. 210, 227, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (holding that involuntary medication of an inmate with a serious mental illness is constitutionally appropriate where the inmate is dangerous to himself or others and the treatment is in the inmate's medical

On appeal, Evans challenges the district court's conclusions that the Government satisfied the first, second, and fourth parts of the *Sell* test.[4] First, he argues that the Government does not have an "important" interest in trying him under *Sell*'s first part. Next, he claims that the Government failed to prove that involuntary medication would "significantly further" its interest or is "medically appropriate" for him under *Sell*'s second and fourth parts.[5] We address these contentions in turn.

### III. Importance of the Government's Interest

To render a defendant competent to stand trial through involuntary medication, the government must have an "important" interest in trying the defendant.

*Id.* at 2184 (emphasis omitted). The government's interest is "important" if the defendant is both charged with a "serious crime" and "[s]pecial circumstances" do not undermine the government's interest in trying him for that crime. *Id.* The district court resolved both of these issues in the Government's favor. Evans disagrees with both conclusions. The district court's determination that the government's interest is "important" is a legal conclusion that we review de novo, *see Gomes*, 387 F.3d at 160, although we review any factual findings relevant to this legal determination for clear error. *Cf. United States v. Holmes*, 376 F.3d 270, 273 (4th Cir.2004) (applying the clear error standard of review to the district court's factual findings on appeal from denial of the appellant's motion to suppress).

---

interest), or, on the other hand, for the purpose of prosecuting an incompetent defendant, *see Sell v. United States*, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003) (*Sell*). In *Sell* the Supreme Court admonished that [a] court need not consider whether to allow forced medication for [the purpose of rendering the defendant competent to stand trial], if forced medication is warranted for a *different* purpose, such as the purposes set out in *Harper* related to the [imprisoned] individual's dangerousness, or purposes related to the [imprisoned] individual's own interests where refusal to take drugs puts his health gravely at risk. 123 S.Ct. at 2185 (emphasis in original). Here, the magistrate judge found that Evans neither posed a danger to himself or others in the prison community, nor was he "gravely" ill. (J.A. at 159.) The parties do not challenge this finding. We must therefore consider whether the involuntary medication proposed here was constitutional under *Sell*'s frame-work. Because *Sell*, and not *Harper*, provides the framework for deciding the Government's motion for involuntary medication here, this opinion's discussion of involuntary medication is limited to the criteria for administration of involuntary medication for prosecutorial purposes.

4. *Sell*'s third part—the necessity requirement—means that the court must consider whether any "alternative, less intrusive treat-

ments [than involuntary medication] are [']likely to achieve substantially the same results." 123 S.Ct. at 2185. In addition, "the court must consider less intrusive means for administering the drugs [than involuntary administration], *e.g.,* a court order to the defendant backed by the contempt power, before considering more intrusive methods." *Id.* The district court found that there were no less intrusive treatments than medication. Evans does not challenge this finding on appeal. Moreover, Evans's counsel confirmed at oral argument that Evans would not be persuaded to take antipsychotic medication pursuant to a court order. *Sell*'s third factor is therefore resolved in the Government's favor.

5. Evans also argues that the Due Process Clause requires the Government to prove its case under Sell by clear and convincing evidence. Evans, however, failed to raise this argument before the district court. He has therefore waived it on appeal. *See Holland v. Big River Minerals Corp.,* 181 F.3d 597, 605 (4th Cir.1999). Nothing in this opinion precludes the district court from considering the issue of the appropriate standard of proof on remand.

### A. Seriousness of the Offense

Evans claims that the district court erred by focusing on the statutory maximum penalty for the crimes with which he was charged as the determinant of seriousness. He contends that the proper focus should be on the sentence he was most likely to receive under the Sentencing Guidelines, and argues that because his probable guideline range is only 14–20 months, the charges against him were not serious. We disagree with Evans's analysis of this issue.

■ In discussing the seriousness requirement, the Supreme Court in *Sell* said only that

> a court must find that important governmental interests are at stake. The Government's interest in bringing to trial an individual accused of a serious crime is important. That is so whether the offense is a serious crime against the person or a serious crime against property. In both instances the Government seeks to protect through application of the criminal law the basic human need for security.

123 S.Ct. at 2184 (emphasis omitted). Although the Court in *Sell* offered no guidance on how to determine the seriousness of an offense, the Supreme Court has described "serious" crimes in other contexts. In *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), for example, the Supreme Court observed that the Sixth Amendment's right to trial by jury exists only in "serious" criminal cases. *Id.* at 158, 88 S.Ct. 1444. It admonished that "the penalty *authorized* for a particular crime is of major relevance in deter-

mining whether it is serious." *Id.* at 159 88 S.Ct. 1444 (emphasis added). In fact, it explicitly rejected Louisiana's argument that the proper focus of whether a crime is "serious" for purposes of the Sixth Amendment right to trial is the *actual* "length of punishment." *Id.* at 162 n. 35, 88 S.Ct. 1444. More recent right-to-jury cases have explicitly found that the primary measure of seriousness is "the maximum penalty attached to the offense." *See, e.g., Lewis v. United States*, 518 U.S. 322, 326, 116 S.Ct. 2163, 135 L.Ed.2d 590 (1996).

■ We believe that in light of *Duncan* and its progeny, it is appropriate to focus on the maximum penalty authorized by statute in determining if a crime is "serious" for involuntary medication purposes. Such an approach respects legislative judgments regarding the severity of the crime, *see Blanton v. North Las Vegas*, 489 U.S. 538, 541–42, 109 S.Ct. 1289, 103 L.Ed.2d 550 (1989) ("The judiciary should not substitute its judgment as to seriousness for that of a legislature, which 'is far better equipped to perform the task, and [is] likewise more responsive to changes in attitude and more amenable to the recognition and correction of their misperceptions in this respect.'" (quoting *Landry v. Hoepfner*, 840 F.2d 1201, 1209 (5th Cir. 1988) (alteration in original))), while at the same time giving courts an objective standard to apply, *see Lewis*, 518 U.S. at 325–26, 116 S.Ct. 2163.[6]

■ A focus on a defendant's probable guideline range to determine an offense's seriousness would similarly respect legislative judgments, *see Mistretta v. United States*, 488 U.S. 361, 412, 109 S.Ct. 647,

---

6. We do not believe that the Supreme Court's focus in *Sell* on "whether the offense is a serious crime *against the person* or a serious crime *against property*," 123 S.Ct. at 2184 (emphasis added), imposes the additional requirement that the crime also be against either person or property in order to be a "serious" one. Instead, we believe the Supreme Court was merely describing the charges Sell himself faced: intimidation of a witness, a crime against the person, and fraud, a crime against property. *Id.* at 2179.

102 L.Ed.2d 714 (1989) (holding that the sentencing guidelines are promulgated pursuant to Congress's valid delegation of legislative authority), while also giving courts an objective standard to apply. Such a focus, however, would simply be unworkable because at this stage in the proceedings, there is no way of accurately predicting what that range will be. The final guideline range is computed only after the district court makes findings of fact relevant to sentencing categories. These factual findings are based on the Presentence Report (PSR), which the Probation Office prepares pursuant to testimony presented at trial or the plea and a detailed investigation of the defendant. A focus on the probable guideline range as the barometer of seriousness would shift this fact-finding to a time before the defendant's trial or plea, before the Probation Office prepares its report, and at a time when the district court has already ruled that the defendant himself is incompetent. Fact-finding under these circumstances—with no PSR and with the defendant unable to testify or render other assistance to counsel—would be uniquely inappropriate.[7]

■ To answer the question of whether the crimes on which Evans was indicted were "serious," we are not required to set forth any rigid rule as to what the statutory maximum must be for a crime to be a serious one. Even if the charge of assaulting, resisting, or impeding an agricultural official under § 111(a)(1), a misdemeanor whose maximum term of imprisonment is one year, is not of sufficient seriousness alone, we conclude that the second charge—threatening to murder a federal judge under § 115(a)(1)(B), a felony whose maximum term of imprisonment is 10 years—is "serious" under any reasonable standard. Cf. Baldwin v. New York, 399 U.S. 66, 71, 90 S.Ct. 1886, 26 L.Ed.2d 437 (1970) (holding that crimes authorizing punishment for over six months are "serious" under Duncan for purposes of the Sixth Amendment's right to trial by jury). We think it beyond dispute that the Government does have an important interest in trying a defendant charged with a felony carrying a maximum punishment of 10 years imprisonment.[8]

7. The briefs and oral argument in this case were completed before the Supreme Court issued its decision in United States v. Booker, — U.S. —, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) invalidating the United States Sentencing Guidelines under the Sixth Amendment, id. at 752, severing 18 U.S.C.A. §§ 3553(b)(1) (requiring sentencing courts to impose a sentence within the applicable guidelines) and 3742(e) (setting forth appellate standards of review) from the Sentencing Reform Act of 1984, id. at 764, and interpreting the Act as implying a "reasonableness" standard of review, id. at 766. Under Booker, district courts are no longer required to sentence a defendant within the applicable guideline range, but must only consider the defendant's guideline range in determining the appropriate sentence. Id. at 767 ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."); 18 U.S.C.A. §§ 3553(a)(4), (5) (West Supp.2004). Be-

cause the district courts now have some leeway in determining whether to sentence a defendant within or outside of the probable guideline range, the post-Booker probable guideline range may be less accurate an indicator of the defendant's actual sentence as the pre-Booker probable guideline range. Our consequent inability to predict a defendant's actual sentence based on his probable guideline range is another reason to reject as unworkable Evans's suggestion that we should determine seriousness solely by examining his probable guideline range.

8. By focusing on only one of the two crimes with which Evans is charged, we do not imply that courts may not aggregate charges when determining whether the government has an important interest. To resolve the case before us, it is enough to say that the Government has an important interest based on the felony charge alone.

## B. Special Circumstances

Although we conclude that Evans is facing a serious charge, the Supreme Court noted in *Sell* that the state's important interest in prosecuting the defendant on serious charges can be "lessen[ed]" under "[s]pecial circumstances." 123 S.Ct. at 2184. "The defendant's failure to take drugs voluntarily, for example, may mean lengthy confinement in an institution for the mentally ill[, a fact] that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Id.* "The same is true," the Court observed, "of the possibility that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed)." *Id.* (citation omitted).

Evans argues that the Government's interest in prosecuting him, even if on a "serious" charge, is made unimportant because: (1) he has already been incarcerated for over two years; and (2) there is a possibility he could be civilly committed if he is not involuntarily medicated. The district court correctly rejected these arguments.

First, while the length of Evans's confinement for evaluation may lessen the importance of the state's interest, it does not defeat it. Even if credited with the over two years he has spent at Butner and New River Valley under 18 U.S.C.A. § 3585(b) (West 2000) (providing that a defendant shall be given credit for certain pre-sentencing time spent in detention), Evans is still facing almost 8 years in prison on the felony charge against him. Again, under any reasonable standard, the Government has an important interest in trying a defendant who is charged with a crime that has the potential of an almost 8–year prison term.[9] Second, it is unlikely that Evans would be civilly committed. Both the IM report and Dr. Robbins's testimony explained that Evans would not meet the criteria for civil commitment under 18 U.S.C.A. § 4246 (West 2000). Moreover, as the district court found, because the evidence against Evans at his trial for threatening to murder a United States judge would be in the form of testimony from the New River Valley inmates to whom Evans communicated his threats against the magistrate judge, "it may be difficult or impossible to try [Evans in the future if he] regains competence after years of commitment during which [the] memories [of those who will testify for and against him] may fade." *Sell,* 123 S.Ct. at 2184.[10] Evans's past detention and unlikely future civil confinement do not, there-

---

9. By focusing on the amount of time with which Evans would be credited under 3585(b), we do not imply that time is the only consideration relevant to whether special circumstances undermine the government's interest. There may be purposes of criminal punishment unrelated to the actual length of incarceration that would continue to give the government an important interest in trying a defendant accused of a serious crime even if the time he spends in pre-trial detention approaches the statutory maximum penalty for the crime with which he is charged. *See Sell,* 123 S.Ct. at 2184 (noting that the defendant's pre-trial confinement "affects, but does not totally undermine, the strength of the need for

prosecution."). Because we conclude that the Government continues to have an important interest in trying Evans based on the potential length of his incarceration alone, we need not consider this more difficult issue here.

10. Evans argues that the district court made no factual finding on this point and that it was therefore improper for the court to consider it. We believe, however, that the district court was within its discretion in taking judicial notice of the fact that memories may fade over time. *See Gomes,* 387 F.3d at 161 (concluding, on the basis of briefing alone, that memories may fade over time).

fore, make unimportant the Government's interest in prosecuting him on the serious charges against him.

## IV. Medical Record Relating to Involuntary Medication

■ Evans next argues that even if the Government's interest in restoring his competency is an important one, the district court erred in finding that the Government satisfied *Sell*'s second and fourth parts, *i.e.* that involuntary medication would "significantly further"[11] its interest and was "medically appropriate" for him. He contends that (1) because the IM report provided no detail with respect to the specific medication the Butner staff proposed to give him, and (2) because the IM report failed to examine with sufficient particularity the effect that antipsychotic medication would have on him as an individual, it was impossible for the district court to evaluate these two elements of the *Sell* formula. We review the district court's resolution of *Sell*'s second and fourth parts for clear error, *see Gomes*, 387 F.3d at 160, and agree with Evans that the district court clearly erred because it was without adequate information to support its holdings as to those parts.

First, we are unable to discern from the IM report what medication the Butner staff planned to give Evans to restore his competency. The report generally discusses the benefits of atypical antipsychotic medication over conventional antipsychotics, but it never actually states the particular type of atypical antipsychotic medication the Butner staff planned to administer to Evans. The government must propose a course of treatment in which it specifies the particular drug to be administered. *See Sell*, 123 S.Ct. at 2185 (describing the necessity of determining whether "particular drugs" are medically appropriate); *id.* at 2187 ("Whether a particular drug will tend to sedate a defendant, interfere with communication with counsel, prevent rapid reaction to trial developments, or diminish the ability to express emotions are matters important in determining the permissibility of medication to restore competence."); *Riggins*, 504 U.S. at 133–37, 112 S.Ct. 1810 (discussing the medical appropriateness of the particular antipsychotic drug Mellaril). This stands to reason because *Sell* requires an evaluation of possible side effects, and different atypical antipsychotics will have different side effect profiles. Without at least describing the proposed course of treatment, it is tautological that the Government cannot satisfy its burden of showing anything with regards to that treatment, much less that it will "significantly further" the Government's trial-related interests and be "medically appropriate" for Evans. Second, even assuming the IM report outlined a sufficiently detailed treatment plan, we would nevertheless conclude that the district court clearly erred in granting the Government's motion. While the IM report does indeed state that involuntary medication would "significantly further" the Government's interests and be "medically appropriate" for Evans, it failed to explain how it reached its conclusions on these points with respect to Evans as an individual. In other words, it nowhere indicates that the Butner staff actually considered Evans's *particular* mental and physical condition in reaching these conclusions.

---

11. As discussed, whether involuntary medication will "significantly further" the government's interest in trying Evans under *Sell*'s second factor is determined by examining whether such medication is "substantially likely" to restore him to competency and "substantially unlikely" to produce side effects that will interfere significantly with his ability to assist counsel. 123 S.Ct. at 2185.

With respect to whether involuntary medication would "substantially further" the Government's interest, the IM report concluded that atypical antipsychotic medication would be "substantially likely" to restore Evans's competency merely because such medication is the "primary" way to treat Schizophrenia. It nowhere addressed Dr. Robbins's concern that Evans's delusions of governmental conspiracies that have persisted longer than 40 years will resist involuntary medication precisely because the government administers the medication. In addition, the IM report concluded that side effects that would interfere with Evans's ability to assist counsel were "substantially unlikely" on the basis that newer antipsychotic medications "have a more favorable side effect profile [than older antipsychotics] in many patients." The report never addressed why it concluded that Evans, an elderly man with diabetes, hypertension, and asthma who takes a number of medications to treat these conditions, would not experience side effects that would interfere with his ability to assist counsel. With respect to whether involuntary medication would be "medically appropriate" for Evans, the IM report states only that involuntary medication is "medically appropriate" because "the standard treatment of anyone with [Evans] condition of Schizophrenia would involve the prescription of antipsychotic medication." (J.A. at 316.) Again, the report nowhere indicates that it considered Evans's *particular* medical condition in reaching its conclusion.

Instead of analyzing Evans as an individual, the report simply sets up syllogisms to explain its conclusions: (1) atypical antipsychotic medications are generally effective, produce few side effects, and are medically appropriate, (2) Evans will be given atypical antipsychotic medications, (3) therefore, atypical antipsychotic medication will be effective, produce few side effects, and be medically appropriate for Evans. To hold that this type of analysis satisfies *Sell*'s second and fourth factors would be to find the government necessarily meets its burden in every case it wishes to use atypical antipsychotic medication. We do not believe that *Sell*'s analysis permits such deference.

We conclude that for the district court even to assess whether involuntary medication is constitutionally permissible under *Sell*'s second and fourth factors, the government must set forth the particular medication, including the dose range, it proposes to administer to Evans to restore his competency. *See Sell,* 123 S.Ct. at 2185 ("The specific kinds of drugs at issue may matter.... Different kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success."). To approve of a treatment plan without knowing the proposed medication and dose range would give prison medical staff carte blanche to experiment with what might even be dangerous drugs or dangerously high dosages of otherwise safe drugs and would not give defense counsel and experts a meaningful ability to challenge the propriety of the proposed treatment. Yet we believe that a reasonable range rather than an exact dosage is appropriate because the latter would unduly limit the medical provider's ability to adapt its treatment to fit the often vagarious bodily and psychical responses to medical treatment. We believe that this approach best balances the need for effective judicial review with the need to give prison medical staff the flexibility subtly to modify their proposed course of treatment to fit the defendant's individual medical condition if the treatment does not work exactly as initially expected.

While it is necessary for the government to set forth the particular

medication and dose range of its proposed treatment plan, such a description alone is not sufficient to comply with *Sell.* Rather, the government must also relate the proposed treatment plan to the individual defendant's particular medical condition. In other words, the government, considering all of the particular characteristics of the individual defendant relevant to such a determination,[12] must first show that the treatment plan will "significantly further" its interests. It must do so by demonstrating that the proposed treatment plan, *as applied to this particular defendant,* is "substantially likely" to render the defendant competent to stand trial and "substantially unlikely" to produce side effects so significant as to interfere with the defendant's ability to assist counsel in preparing a defense. Second, the government, again considering all of the circumstances relevant to the particular defendant, must show that its proposed treatment plan is "medically appropriate." To do so, the government must spell out why it proposed the particular course of treatment, *see id.* at 2185 (treatment is "medically appropriate" if it is "in the patient's best medical interest in light of his medical condition"), provide the estimated time the proposed treatment plan will take to restore the defendant's competence and the criteria it will apply when deciding when to discontinue the treatment, describe the plan's probable benefits and side effect risks[13] for the defendant's particular medical condition, *see id.* (observing that efficacy and side effects are relevant to question of whether the treatment is "medically appropriate"), show how it will deal with the plan's probable side effects, and explain why, in its view, the benefits of the treatment plan outweigh the costs of its side effects.[14] The Government's evidence in this case fell well short of this standard.

## V. Conclusion

For the foregoing reasons, we vacate the district court's order granting the Government's motion to allow involuntary medication and remand with instructions for the district court to reassess the motion

---

12. Although we have mentioned the length of time Evans has suffered from schizophrenia, Evans's other health problems, and the medications he is taking, we leave to the district court to determine, in the first instance, what factors may be "relevant" under *Sell.*

13. In considering whether involuntary medication will "significantly further" the government's trial-related interests, the district court should consider, inter alia, whether the medication is "substantially unlikely" to produce side effects that will interfere with the defendant's "ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Sell II,* 123 S.Ct. at 2185. In considering whether involuntary medication is "medically appropriate," the district court should consider whether the medication is likely to produce *any* adverse side effects in the defendant, *see Sell II,* 123 S.Ct. at 2185, including, but not limited to those that may interfere with the defendant's right to a fair trial. *Id.*

14. We do not imply that the government may set forth only one treatment plan. Instead, the government may set forth alternate treatment plans in the event the primary treatment plan is defective for one reason or another. If the government chooses to set forth alternate treatment plans, it must explain which plan it intends to use first, second, *etc.,* and why it has so ordered the plans. The government must provide particularized information regarding each treatment plan as applied to the individual defendant, as explained herein, and the district court must assess the various treatment plans independently of one another. To the extent the government proposes, and the district court approves, a treatment plan that proves defective for one reason or another, nothing in this opinion would preclude the government from filing a second motion for involuntary medication and proposing an alternate treatment plan.

after affording the parties the opportunity to supplement the record in a manner consistent with this opinion.

*VACATED AND REMANDED WITH INSTRUCTIONS.*