**UNITED STATES of America**

v.

**Kelly Victorio BAUGH, Defendant.**

**Criminal No. 3:99cr42.**

United States District Court,
E.D. Virginia,
Richmond Division.

Feb. 17, 2011.

David T. Maguire, Esquire, Assistant United States Attorney, United States Attorney's Office, Richmond, VI, for United States of America.

Paul G. Gill, Esquire, Valencia D. Roberts, Esquire, Office of the Federal Public Defender, Richmond, VI, for Defendant.

## MEMORANDUM OPINION
## REDACTED VERSION

ROBERT E. PAYNE, Senior District Judge.

This matter is before the Court on the Defendant's OBJECTION TO AND APPEAL OF INVOLUNTARY MEDICATION ORDER (Docket No. 98) and his related MOTION TO STAY ORDER GRANTING MOTION OF THE UNITED STATES FOR AUTHORIZATION TO ADMINISTER INVOLUNTARILY MEDICATION (Docket No. 97). For the reasons set forth below, both motions will be DENIED.

## BACKGROUND [1]

On July 1, 1999, the Defendant, Kelly Victorio Baugh, was sentenced to 130 months in prison, to be followed by five years of supervised release, for possessing with intent to distribute five grams or more of cocaine base, in violation of 21 U.S.C. § 841(a)(1). Baugh was sentenced under the Guidelines in effect in 1999. His offense level was 19. His criminal history category was VI. Baugh's criminal history was quite serious. He had been convicted of attempted burglary, criminal possession of marijuana, second-degree robbery, attempted criminal possession of a weapon, driving on a suspended license, failure to appear, and receipt of stolen property, among other offenses.

During the course of serving his federal sentence, Baugh exhibited symptoms of paranoid delusions. Those symptoms first surfaced in April 2001, following a year in a segregated housing unit where Baugh was awaiting disposition of a charge of assaulting a federal corrections officer with a dangerous weapon. Baugh reported derogatory auditory hallucinations and claimed to be suffering from HIV when he in fact was not infected with the virus. He also attempted suicide during this time-frame.

Those events prompted the Bureau of Prison to transfer Baugh to the United States Medical Center for Federal Prisoners in Springfield, Missouri, for a competency evaluation. There, officials diagnosed him with [redacted], but deemed him competent in light of his then ostensibly stable mental status. Baugh reportedly responded well to psychotropic medication.

In August 2005, Baugh again displayed psychotic tendencies, this time while incarcerated at United States Penitentiary ("USP") Coleman. He reported being able to hear his sister's voice from inside his cell through a broadcast machine which, he claimed, prison officials had provided him. Those who witnessed Baugh's conduct at USP Coleman described him as rambling and incoherent. Although Baugh was seen by the prison's Psychology Services, he did not receive medication or any other form of meaningful treatment for his mental illness through March 2007.

When Baugh was transferred to USP Allenwood he continued to suffer from paranoid ideas and auditory hallucinations.

---

1. Magistrate Judge M. Hannah Lauck provides a comprehensive history of the factual record in her sealed memorandum opinion (Docket No. 78). Housed in this section is but a summary of her more thorough account.

He consented sporadically to take [redacted], an antipsychotic medication, but eventually declined to take medication altogether.

Around June 2007, while he was at USP Allenwood, Baugh's psychosis worsened. He began to talk of government surveillance and efforts of the United States Attorney's Office to spy on, and steal from him. He expressed a belief that the government was soliciting other inmates to be confrontational with him; and he continued to suffer from auditory hallucinations of family members. He was released from prison on supervised release in December 2008.

Upon being released by federal authorities, Baugh was taken into custody by the New York Parole Authority and incarcerated until late December 2008. He returned to Virginia sometime shortly afterward at his probation officer's urging. In Virginia, Baugh continued to exhibit signs of mental illness. On April 9, 2009, Baugh's probation officer had to call Hanover County authorities when Baugh refused to leave his sister's home, after expressing the view that there was "going to be a big fighter [sic] there," if he had to keep dealing with "these people." Following this episode, Baugh was evaluated by Hanover County "Crisis Service," but was not hospitalized.

On May 8, 2009, the probation officer met with Baugh, who then agreed to modify the conditions of his probation to include as a requirement that Baugh undergo mental health treatment. On May 20, 2009, the Court approved that modification.

On June 1, 2009, Baugh reported to his probation officer that he and his sister had gotten into an altercation and that his sister had called the police as a result. His sister told the probation officer that she feared Baugh and wanted him to get help for his mental illness.

On July 6, 2009, Baugh's sister called the probation officer and advised that she had "kicked Baugh out of her home" because he had threatened to punch her in the face. A day later, on July 7th, Baugh told his probation officer that he wanted to harm his sister because she had forced him out of her home and because, in his mind, she had damaged some of his belongings. When informed by the probation officer that he could be criminally charged for physical assault, Baugh responded that his religion permitted him to admonish his sister, depending on where he "lashe[d]" her.

In the ensuing days and weeks, Baugh's violent behavior continued unabated. He locked his father inside his home, stating that his father would "die a cripple." And, he was arrested and charged by Henrico County Police for choking another one of his sisters and threatening to kill her. As a result of the latter occurrence, on October 19, 2009, Baugh was convicted of misdemeanor assault in state court and sentenced to six months in prison, with all six months suspended.

On July 29, 2009, the probation officer filed a Petition and Order on Supervised Release seeking revocation of Baugh's supervised release. The petition alleged that Baugh had violated a Mandatory Condition of Release because he had committed the state crime of assault and battery. The petition also alleged that he had violated a Special Condition of Release because he had failed to participate satisfactorily in a mental health treatment program. That same day, on July 29th, the Court signed the petition, and an arrest warrant was issued. The maximum statutory penalty for Baugh's violation of the terms of his supervised release is thirty-six months in

prison. The advisory guideline range is eight to fourteen months in prison.

On October 21, 2009, Baugh made his initial appearance before Magistrate Judge M. Hannah Lauck on the Petition On Supervised Release. On October 26, 2009, the United States filed a MOTION FOR MENTAL EXAMINATION (Docket No. 61) to determine if Baugh was mentally competent to stand trial and to evaluate his sanity at the time of the charged violations. That motion was granted, and Baugh was transferred to Federal Medical Center ("FMC") Devens for a competency evaluation. While at FMC Devens, Baugh conveyed that he was hostile toward his family and people in general because he believed that they were spying on him and taking his belongings. He consistently refused to consent to vital sign measures or to take antipsychotic medications. On November 24, 2009, Baugh had a seemingly unprovoked outburst that necessitated his transfer to a locked unit. After pacing his cell, Baugh shouted, "Someone in this unit will be sucking my dick tonight!" and "Uprise, you're all a bunch of caged-in pigs!"

Baugh's time at FMC Devens culminated in a psychiatric report deeming him mentally incompetent. Dr. Miriam Kissin, a forensic psychologist, diagnosed Baugh with [redacted]. Dr. Kissin reasoned that Baugh was incompetent to stand trial in large part because "his [redacted] thought process makes it difficult for him to maintain attention and focus on anything other than his [redacted] concerns." She further surmised that Baugh suffers from a "chronic and severe mental illness that substantially disrupts his functioning" and that "his treatment non-compliance con-

tributes to his instability." On February 10, 2010, Magistrate Judge Lauck held a competency hearing, found that Baugh was incompetent to stand trial and committed him to the custody of the United States Attorney General for hospitalization and treatment under 18 U.S.C. § 4241(d) (Docket No. 70).[2]

Baugh was then taken to FMC Butner. There, he again was diagnosed as suffering from a disabling mental condition and was found to be incompetent to stand trial. Notably, on no less than two occasions at FMC Butner, Baugh had to be placed in twenty-three-hour lock-down, once for verbally assaulting a police officer and another time for physically assaulting an inmate. Baugh voluntarily took one dose of [redacted] while at Butner, but otherwise refused medication. The Butner forensic report, dated July 20, 2010, requested that the Court order that Baugh be forcibly medicated to restore his competency under *Sell v. United States*, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003). In the report, Dr. Bryon Herbel diagnosed Baugh with [redacted]. Dr. Herbel described Baugh's symptoms to include [redacted].

The report concluded that, based on the *Sell* factors, the Court should "consider authorizing the involuntary administration of antipsychotic medication" as described in the report's treatment plan. It indicated that harmful side effects are rare with antipsychotic medications, and that Baugh, like the vast majority of similarly situated mentally ill individuals who receive antipsychotic medication, likely would be restored to competency with the involuntary administration of antipsychotic medication.

On August 26, 2010, the United States filed a MOTION FOR "SELL" HEAR-

---

2. The Devens psychiatric report did not answer whether Baugh was sane when at the time of the charged violations. The report indicated that there was insufficient informa-

tion to make such a determination and that it would be likely that more accurate information could be gained once Baugh achieved a higher level of psychiatric stability.

ING OR ALTERNATIVELY HOSPITALIZATION (Docket No. 72) for the purpose of restoring the Defendant to mental competency, if necessary, through forcibly administering medication. On September 30, 2010, by way of an order (Docket No. 79) and accompanying sealed memorandum opinion (Docket No. 78), Magistrate Judge Lauck granted the United States' motion and authorized it to administer medication to Baugh involuntarily in conformity with the proposed treatment plan of the Butner forensic report. On October 26, 2010, the Defendant filed a MOTION FOR RECONSIDERATION OF DOCKET NO. 79 ORDER AND DOCKET NO. 78 SEALED MEMORANDUM OPINION (Docket No. 83). The motion rested largely on the recent decision in *United States v. White*, 620 F.3d 401 (4th Cir.2010). On November 23, 2010, Magistrate Judge Lauck, after reassessing all issues in perspective of *White*, denied Baugh's motion with another order (Docket No. 96) and accompanying memorandum opinion (Docket No. 95). Baugh now appeals Magistrate Judge Lauck's decision to this Court.[3]

## DISCUSSION

Baugh asserts that the Court must review *de novo* the decision ordering forced medication. He cites one appellate decision, *United States v. Rivera–Guerrero*, 377 F.3d 1064 (9th Cir.2004), finding de novo review to be required because of the importance of the issue. He also cites a district court decision, *United States v. Dallas*, 461 F.Supp.2d 1093 (D.Neb.2006), which recognized *Rivera–Guerrero* and chose to exercise *de novo* review of a

magistrate judge's decision to medicate a defendant involuntarily. The United States does not object to a de novo standard of review because it contends that Magistrate Judge Lauck's decision should be upheld under any standard. It is unnecessary to decide the appropriate standard of review because, as the United States argues, the order for forced medication of Baugh is correct upon application of either standard.

Baugh challenges the order for forced medication on two grounds. First, Baugh argues that the four-factor test articulated by the Supreme Court in *Sell v. United States*, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003), for determination of whether a mentally ill criminal defendant can be administered medication involuntarily to render him competent for trial, is inapplicable to the context of supervised release revocation hearings as a matter of law. *See* Defendant's Objections to and Appeal of Involuntary Medication Order ("Def. Obj.") at 5. Second, Baugh argues that, even if *Sell's* test is applicable in the context of supervised release revocation hearings, *Sell*, as applied to the facts in this case, does not justify medicating Baugh against his will. *See id.* at 5–6. Neither of those objections pass muster.

## A. Applicability of Sell To Supervised Release Proceedings

■ For his first argument, Baugh relies on the fact that, to date, neither the Supreme Court nor any Court of Appeals has held that *Sell* applies to a defendant facing a supervised release revocation hearing.[4] But just as the absence of au-

---

3. *See* OBJECTION TO AND APPEAL OF INVOLUNTARY MEDICATION ORDER (Docket No. 98), filed December 7, 2010.

4. Baugh did not advance this rationale explicitly in his brief, but his statement that "[n]o

appellate court has treated the hearing of a supervised release revocation as constituting an important governmental interest for *Sell* purposes" works to the same effect. Def. Obj. at 7.

thority for a proposition does not necessarily make the proposition true, the fact that no appellate courts have held that *Sell* is applicable to supervised release revocation hearings does not mean that *Sell* cannot—or should not—be so applied. It is true that *Sell's* holding was limited. As Baugh highlights, in *Sell,* the Supreme Court wrote that "the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial." *Sell,* 539 U.S. at 179, 123 S.Ct. 2174 (emphasis added). Cognizant of the liberty interest involved in any governmental intrusion of this kind, the Court qualified its statement by listing factors that a court must consider before ordering a defendant medicated against his will.[5] *See id.*

Baugh rests his first argument on the use of the word "trial" in *Sell.* For Baugh, the Court chose that word deliberately with a view to cabin *Sell's* application only to those instances when the government seeks to prosecute a mentally incompetent defendant on charges that, absent a plea, must be proven beyond a reasonable doubt at trial. The argument ignores the simple fact that, in *Sell,* the issue of forced medication arose because the defendant was facing trial. Nothing in *Sell* suggests that the Court confined the application of the *Sell* principles only to a trial setting.

Moreover, a hearing on a supervised release violation is the functional equivalent of a "trial." At the hearing, the defendant faces charges to which the defendant must plead guilty or not guilty. The defendant is represented by counsel. The government must prove the charges and the defendant may present a defense.

Thereafter, a judgment of guilty or not guilty is entered. If the judgment is guilty, the Court imposes a sentence which can, as in this case, lead to a substantial additional period of incarceration.

That the government does not have to prove charged violations of supervised release conditions by the heightened reasonable doubt standard that governs traditional criminal trials (it being that supervised release violations need only be proved by a preponderance of the evidence), does not make a supervised release revocation hearing any less a trial. And, at such hearings, the charged party's liberty is at stake and, as in a criminal trial, the burden is on the government to prove that the charged party's interest in his liberty must rightfully cede to the countervailing interest of society to be safe in its person and effects.

Perhaps because Baugh refuses to acknowledge the functional similarities of supervised release revocation hearings and criminal trials, he fails to appreciate that the former, like the latter, serve an important governmental function. The government, in proceeding against defendants who violate the terms of their supervised release, fulfills a number of important functions, not the least of which is protecting the public from individuals who, despite already having been convicted of a crime or crimes, continue to flout the law or the terms of a lawfully imposed sentence, or both. The Court rejects Baugh's argument to the extent that it reads *Sell* to mean that, absent a jury and the government being subject to a reasonable doubt standard, an important governmental interest cannot exist. Nothing the Supreme Court said in *Sell,* nor anything that any Court of Appeals has said since, justifies

---

**5.** The factors are enumerated *infra* in the Opinion's discussion of Baugh's second argument.

categorically denying the application of *Sell* in the context of supervised release revocation hearings.

The fact of the matter, as Judge Wilkinson noted, albeit within the specific purview of the Fourth Amendment's "search and seizure" clause, is that "constitutional adjudication" generally involves balancing governmental and individual interests. *See generally Mora v. The City of Gaithersburg,* 519 F.3d 216 (4th Cir.2008). The Fifth Amendment's "due process" clause is no exception, and the Supreme Court's decision in *Sell* drives this point home. In *Sell,* the Court promulgated a four-factor test through which courts could weigh (1) the government's interest in forcibly rendering a criminal defendant competent with medication against (2) the defendant's individual interest in not having his body so invaded, with the purpose of animating, and ultimately honoring, the Constitution's due process right. To foreclose the application of such balancing, as a matter of law, in the context of supervised release violation hearings not only ignores the significant safety and rehabilitative functions that the government performs in proceeding against convicted criminals who violate the terms of their supervised release, but also ignores the prevailing framework of constitutional jurisprudence applicable to analysis of constitutional rights. For the foregoing reasons, Baugh's argument that *Sell* cannot be applied to supervised release revocation hearings as a matter of law must be rejected. Magistrate Judge Lauck did not err in assessing the merit of the government's forcible medication motion through *Sell's* analytical framework. And, the same framework must be employed here.

**B. Application of Sell To The Facts In This Case**

■ Baugh's second argument, that, as applied, *Sell* does not permit forcibly medi-

cating him is no more availing. *Sell* established four factors that must be satisfied before a defendant can be involuntarily administered medications to render him competent:

> First, a court must find that *important* governmental interests are at stake. . . .

> Second, the court must conclude that involuntary medication will *significantly further* those concomitant state interests [the government's interest in subjecting the defendant to trial and the government's interest in assuring a fair trial for the defendant]. . . .

> Third, the court must conclude that involuntary medication is *necessary* to further those [governmental] interests. . . .

> Fourth, . . . the court must conclude that administration of the drugs is *medically appropriate, i.e.,* in the patient's best medical interest in light of his medical condition.

539 U.S. at 180–81, 123 S.Ct. 2174. The government has the burden of proving all four factors by clear and convincing evidence. *United States v. White,* 620 F.3d at 410; *United States v. Bush,* 585 F.3d 806, 814 (4th Cir.2009).

The record shows that the government has met its burden on all the above-quoted factors. It is not necessary to discuss the last three *Sell* factors, because Baugh does not contest that the United States has met its burden on those three factors. Nonetheless, the Court agrees with the Magistrate Judge's accurate and thorough analysis of those factors and adopts them as its own.

Baugh's challenge is addressed to *Sell's* first factor. He contends that the government does not have an "important" interest in proceeding against him for the two

charged supervised release violations. At least to some degree, Baugh's argument harkens back to his prior (flawed) argument that the government can never, under any circumstances have an important interest in rendering a defendant competent for purposes of a supervised release violation hearing. In proffering his second argument, however, Baugh augments his earlier contention with facts unique to his case.

For example, Baugh attempts to downplay the harmful nature of his supervised release violations, characterizing his domestic assault on his sister as a "petty offense" that only got him six months' incarceration, all of which term was suspended. *See* Def. Obj. at 7. As to his other violation, failing to seek mental health treatment, Baugh implies that this, too, is minor. *See id.* ("Mr. Baugh's only alleged violations stem from . . . his failure to seek medical treatment." (emphasis added)). Further attempting to downplay the conduct that is at issue in the supervised release petition, Baugh attributes his actions—insignificant as they were in his eyes—to his mental illness. Baugh claims that, because his psychosis partially brought on his violations, his conduct is "less willful, and therefore less worthy of punishment." *Id.* at 8.[6] Finally, Baugh maintains that any strong interest that the federal government might have in proceeding against him is vitiated by the fact that state authorities already had the opportunity to, and, in fact did, prosecute him for the domestic assault constituting what he asserts to be the most serious charged violation. In short, Baugh argues that his violative conduct falls short of being sufficiently serious to give rise to an important governmental interest in proceeding with a supervised release revocation hearing.

The Court assesses *Sell's* first factor as interpreted by the Supreme Court, and as it has been informed by subsequent decisions of the Fourth Circuit. The Supreme Court recognized in *Sell* that "[t]he Government's interest in bringing to trial an individual accused of a serious crime is important," whether the offense is committed against one's person or property. 539 U.S. at 180, 123 S.Ct. 2174. "In both instances," the Court wrote, "the Government seeks to protect through application of the criminal law the basic human need for security." *Id.* The Court, in *Sell,* did not instruct courts on how to determine which offenses are "serious," but the Fourth Circuit has since directed courts to consider, *inter alia,* the maximum penalty authorized by statute to help assess an offense's seriousness. *United States v. Evans,* 404 F.3d 227, 237 (4th Cir.2005). And, "[a] defendant's probable guidelines range" also might be relevant to determine the seriousness of an offense.

However, the Fourth Circuit has cautioned that using a guidelines range as a "barometer of seriousness" is inappropriate when "there is no way of accurately predicting what that range will be," for instance, "before the defendant's trial or plea, before the Probation Office prepares its [presentence] report, and at a time when the district court has already ruled that the defendant himself is incompetent" but has not yet made findings of fact bearing on the defendant's guidelines range. *See id.* at 238. Here, we know that the advisory guideline range in the event of conviction is eight to fourteen months' imprisonment. And, we know that the statutory maximum punishment is three years' imprisonment. An additional period of supervised release could follow either a guideline or maximum sentence.

---

6. That may, or may not, be true. But, that is an issue to be decided in adjudicating the supervised release violations with which Baugh is charged.

If a court finds that a serious crime is implicated by a defendant's conduct, its analysis on *Sell's* first factor is not over. For even when a mentally incompetent defendant stands accused of a serious crime, special circumstances might obtain that lessen the importance of the governmental interest in bring the defendant to trial. *Sell,* 539 U.S. at 180, 123 S.Ct. 2174. For example, a defendant's refusal to take antipsychotic medication may mean that he faces long-term confinement in an institution, thus reducing the risks normally associated with not punishing a defendant who has committed a serious crime. *Id.* Or, it may be inappropriate to try a defendant who regains competence after years of commitment during which time critical evidence has been lost. *Id.*[7] Also, a defendant may already have been incarcerated for a long time, meaning that any sentence imposed would amount to time served or little more. *Id.*

In this case, Baugh is charged with violating the conditions of his supervised release through his commission of misdemeanor domestic battery and his failure to participate meaningfully in mental health treatment. The charges against Baugh are serious within the meaning of *Sell,* and, indeed within any meaning of the word. Consequently, the government has an important interest in pursuing them against Baugh.

Although Baugh wants the Court to focus myopically on the supervised release violations themselves (the seriousness of which he unduly downplays), it cannot be forgotten that Baugh was subject to supervised release because of an his earlier conviction for possessing with intent to distribute five grams or more of cocaine base, in violation of 21 U.S.C. § 841(a)(1), which carries a maximum statutory sentence of forty years in prison. The sentencing court imposed a term of supervised release as part of Baugh's sentence. The government has an important interest in seeing that aspect of Baugh's sentence implemented before he is released to society to function on his own. In fact, the successful completion of supervised release is of great significance in the scheme of punishment in effect in the federal courts.

The supervised release violations themselves also bespeak an important governmental interest as well. Contrary to Baugh's characterizations, his violations are far from trivial. Though domestic assault is a misdemeanor under state law, it is a crime of violence.[8] The facts of the assault are especially troubling too. Baugh attacked his sister and put her in a chokehold that could have easily killed her. He also verbally threatened his sister's life. On such facts, the seriousness of Baugh's assault cannot be denied.

The gravity of this assault must be considered in perspective of Baugh's prior

---

**7.** Of course, these two factors can cut the other way as well because it is in the interest of the government to see that there is a prompt adjudication of alleged criminal conduct. Indeed, a defendant also is best served by a prompt adjudication.

**8.** The Court is aware of Magistrate Judge Vandervort's opinion in *United States v. Kourey,* 276 F.Supp.2d 580 (W.D.W.Va.2003), finding *Sell* inapplicable where a defendant was charged with violating the terms of his supervised release for his commission of a Class A

misdemeanor. 276 F.Supp.2d at 585. The facts in *Kourey* depart markedly from the facts here. The defendant's supervised release violation in *Kourey* stemmed from misdemeanor destruction of property (a glass door) at a federal courthouse. *Id.* at 581. Baugh's misdemeanor violation here stems from a crime of violence directed against a family member, and therefore is far more serious. The nature and magnitude of the public safety concerns as between the two cases are simply not comparable.

history of violence. Baugh's unprovoked violence on his sister was not the first time he had assaulted others or, for that matter, given his family reason to fear him. His criminal history includes convictions for other crimes of violence, including attempted robbery and robbery. *See* Presentence Investigation Report ¶¶ 15, 18. And, he assaulted a guard while in prison.

Baugh's conditions of supervised release were modified, with his consent, to require that he participate in a mental health treatment program. Violation of that condition is also a serious infraction. Indeed, Baugh himself argues that his mental illness may be the root of his violent ways. That issue, of course, must be decided as part of adjudicating the merits of the supervised release violations. But, the necessity to do that certainly does not diminish the importance of the governmental interest in restoring Baugh to competence so that adjudication can occur.

Finally, and as *Evans* directs, the statutory maximum of thirty-six months in prison for Baugh's violations confirms their serious nature and the importance of the government's interest in having the violations determined on their merits. Although Baugh is not entitled to a jury trial or proof of guilt beyond a reasonable doubt at his supervised release revocation hearing, the violations prompting the hearing carry a maximum punishment of three years.

Baugh's argument that his time served to date subsumes his likely guidelines range of eight to fourteen months cannot be accepted as a special circumstance lessening the importance of the government's interest because, as *Evans* teaches, the Court also must look to the statutory maximum of the offense, not just the guidelines, in determining the seriousness issue. Considering that Baugh has demonstrated a propensity for violence and his serious

criminal history, it is certainly possible that Baugh's sentence, if he is convicted, would exceed the guideline range and might even warrant imposition of a maximum sentence. Therefore, the time served to date does not significantly diminish the importance of the governmental interest in pursuing the charges here at issue. Moreover, the time that it would take to render Baugh mentally competent with medication is not a special circumstance lessening the importance of the government's interest. The experts at FMC Butner predict that restoration to competence with forced medication likely would occur in about four months.

The Court likewise cannot accept Baugh's argument that the government's decision to proceed against him has no bearing on the weight of the government's interest. Although *White* indicated in a footnote that prosecution is a "truism" in any instance where the government seeks forcibly medicating a defendant, 620 F.3d at 413 n. 9, this so-called truism is of unique significance in the supervised release context. In the Court's experience, supervised release violations are not prosecuted with the same frequency as traditional crimes. Supervised release revocation hearings are generally reserved for violations of a serious nature that, in the probation officer's estimation, flout the underlying sentence to which the supervised release term is related or threaten the physical or material safety of the public, or both. Thus, the Court agrees with Magistrate Judge Lauck that the government's decision to move against Baugh in this case is a reason, among many, to find the government's interest to be an important one.

Finally, the possibility that Baugh's mental illness may have contributed to or caused the conduct leading to the charged violations is not a special circumstance

lessening the importance of the government's interest in proceeding against him. First, though the record may support an inference that Baugh's mental condition played a role in his violative conduct, the record by no means establishes this. Indeed, the report from FMC Butner recites that the issue of sanity at the time of the offense is best addressed after Baugh is restored to mental stability. Second, and even if Baugh's mental illness played a role in his violative conduct, Baugh will have an opportunity at the supervised release revocation hearing to raise as a defense his mental state at the time of such conduct.

In sum, the record demonstrates, by clear and convincing evidence, that, under the Supreme Court's decision in *Sell*, Baugh faces serious charges revealing an important governmental interest that may be constitutionally pursued by involuntarily medicating him to restore him to competence. The Court is well aware that the forced administration of antipsychotic drugs is an invasion of an individual's liberty not lightly justified under the Constitution's due process clause. But, in this case, the government has made the requisite showing under *Sell*, as elucidated by the Fourth Circuit's intervening precedent, that the balance of interests warrants involuntarily medicating Baugh, should he continue to refuse medication. The likely outcome of forcibly medicating Baugh is that, within four months, he will be mentally competent to be tried and, if he is found guilty, sentenced on his supervised release violations. This probable scenario will protect the public and serve the important governmental interest of having Baugh face the serious supervised release violations brought against him.

## CONCLUSION

For the foregoing reasons, the Defendant's OBJECTION TO AND APPEAL OF INVOLUNTARY MEDICATION ORDER (Docket No. 98) and his related MOTION TO STAY ORDER GRANTING MOTION OF THE UNITED STATES FOR AUTHORIZATION TO ADMINISTER INVOLUNTARILY MEDICATION (Docket No. 97) will be DENIED.

It is so ORDERED.