**UNITED STATES of America,
Plaintiff,**

v.

**Thomas R. THRASHER, II, Defendant.**

**No. 06–00043–CR–W–HFS.**

United States District Court,
W.D. Missouri,
Western Division.

March 7, 2007.

Larry C. Pace, Federal Public Defender, Kansas City, MO, for Defendant.

Christina Y. Tabor, Office of the United States Attorney, Kansas City, MO, for Plaintiff.

## MEMORANDUM AND ORDER

SACHS, District Judge.

Pending before the court is the Government's application for involuntary medication of defendant, who has been ruled mentally incompetent to stand trial on a firearm possession charge. Magistrate Judge Hays conducted a hearing in Springfield under the *Sell* decision (*Sell v. United States*, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003)) and has filed a report and recommendation that involuntary medication be ordered. For reasons stated, I agree with and will adopt the report and recommendation, although I disagree with one rationale used by Judge Hays, in reliance on *United States v. Evans*, 404 F.3d 227 (4th Cir.2005), but nevertheless reach the same result.

A preliminary matter is briefed by defendant and discussed in the report; that is, whether the reasonable time for examination of defendant has elapsed, and, if so, whether he should be discharged or retained in custody under 18 U.S.C. § 4246. This is not the subject of the Government's motion and should properly be presented by motion filed by defendant. For reasons stated, however, I will sua sponte extend the time for examination under 18 U.S.C. § 4241(d)(2) and will allow six months from the date defendant is first medicated to improve his mental condition. This sua sponte order is subject to reconsideration, if defendant files a motion consistent with his briefing.

I have reviewed the transcript of the hearing and have considered legal issues dealt with in the report and recommendation and in defendant's objections. Most of the issues are adequately described and considered in the report and recommendation and I will avoid mere rephrasing and repetition. The basic issues requiring special attention are outlined in the objections (Doc. 54). Summarily, defendant contends that the Governmental interest is best measured against the likely Guideline sentence, which defendant believes to be 27 to 33 months, a significant portion thereof, over one year, having elapsed since defendant was taken into custody. Defendant further contends that the proposed treatment is too generally described to be adequately appraised as to side-effects and dangers, and likelihood to succeed. There was no expert testimony offered by defendant, however, and the credibility, knowledge, motivation and experience of the Government's witnesses are not challenged. Defendant further contends there has been no exhaustion of less intrusive treatment.

Beginning with the last point, I agree that the record shows it is unlikely that defendant can simply be persuaded to submit to mind-altering medication or that a court order and subsequent contempt proceedings would be anything other than a waste of time, with possible counterproductive results for defendant's paranoid mental condition. The court has very little effective coercive power, given that defendant is in custody. I would of course recommend, and believe the doctors are attuned to trying, further persuasion. Defendant may be advised that the court has ordered the use of medication (unless the doctors refrain from adding to defendant's view that he is being persecuted).

As to likely success and harmful side-effects, the testimony satisfies me that the doctors are on top of these issues. It is true that there has been minimal detailing of exact plans, on a drug by drug analysis. I do not see such a requirement in *Sell*, beyond the record here. I believe the

court is in a condition like that of a guardian, and that elaborate parsing of medical recommendations is not necessary. To a large extent, once the experience and expertise of the doctors is established, and they gain the confidence of the patient, patients and those responsible for them tend to accept medical advice, which includes some trial medications to see how they work, and whether harmful side-effects begin to surface. There is danger that *Sell* will result in over-litigating of such issues, which I do not believe was contemplated by the Supreme Court.[1] Obtaining informed consent from the court should not become a rigorous "federal case", as in malpractice litigation that can take years to resolve. There is more than enough here for giving informed consent in the practical manner that is common in health care situations. See, however, *United States v. Dallas*, 461 F.Supp.2d 1093 (D.Neb.2006).

▮▮▮ The most significant issue here, in my judgment, is the measure of governmental interest in proceeding. Time in custody (and anticipated further imprisonment) is to be weighed against "the expected sentence." *United States v. Bradley*, 417 F.3d 1107, 1116 (10th Cir.2005). *Evans, supra*, and several other cases, tend to look to the statutory maximum sentence. I agree with defendant that the "expected sentence" can be more fairly appraised by estimating a Guideline sentence; I also think other known factors bearing on the likely sentence need to be weighed. The court should place itself in the position of a prosecutor who is fair-minded and objective. That should allow evaluation of the "governmental interest", not some abstraction like the statutory maximum. *See United States v. Schloming*, 2006 WL 1320078 (D.N.J.2006) (followed in *United States v. McCray*, 2007 WL 276149 (D.N.J.2007)). I believe the public interest in further prosecution is much better measured by a Guidelines estimate than by a statutory maximum.[2] I disagree with defendant in this case, however, when he simply notes the Guideline sentence but without considering another issue that a fair-minded prosecutor would seriously take into account; that is, the information that the mentally unstable defendant not only possessed a firearm, contrary to law, but that he was threatening to use it. Although the proof is not developed, a prosecutor is entitled to consider a police report that is not obviously defective. One may suppose, therefore, that an enhanced sentence, perhaps as high as five years, would measure the interest in public safety at this time.[3] As such, I ultimately agree with Judge Hays, that governmental interests favor use of medication, even if

---

1. Computer research discloses a collection of Sell proceedings well into their second or third years, and only one, from Nebraska, that has proceeded more quickly than this one. Without assessing blame I acknowledge that this case has not moved as rapidly as would be ideal.

2. Cases that look to the maximum in determining jury trial rights have a different focus and different concerns. Concepts are governed by context.

3. The affidavit supporting the criminal complaint reports information from a deputy sheriff that defendant told him that perceived harassment "was enough to make him want to shoot someone." The deputy had prior "information" that defendant had "stated that he was going to kill a cop." Affidavit dated January 6, 2006. Even if such allegations have no legal status, law enforcement personnel have a right (probably a duty) to take them seriously-particularly with no ameliorating material in the file. If defendant's counsel contends it is speculative to suppose the facts behind these allegations will influence the sentence it seems even more speculative to say they will not, particularly where, as here, a deteriorating mental condition has been identified.

administered involuntarily.[4] The report and recommendation is therefore adopted. I approve of medication administered involuntarily, if necessary, and authorize the Bureau of Prisons to take such action. SO ORDERED.

It is further ORDERED that defendant remain in treatment for up to six months from the date medication is first administered, with the court retaining jurisdiction to modify the period of examination and treatment.

## REPORT AND RECOMMENDATION

HAYS, United States Magistrate Judge.

This matter is currently before the Court on the Government's Motion Memorializing Request for *Sell* Hearing to Determine Whether Medication May Be Involuntarily Administered to Defendant (doc # 47). For the reasons set forth below, it is recommended that this motion be granted.

## I. INTRODUCTION

On January 6, 2006, a criminal complaint was filed charging defendant Thrasher with being a felon in possession of firearms. On January 27, 2006, an indictment was filed charging defendant Thrasher with being a felon in possession of a firearm and ammunition.

Defense counsel filed a Motion for Determination of Competency on January 31, 2006. As grounds for the motion, defense counsel stated that defendant had been diagnosed with schizophrenia and that he had been hospitalized in the summer of 2005 for mental health treatment. Further, on January 3, 2006, defendant had been placed in a mental health center for four days pursuant to an order from Henry County. The affidavit in support of the request for the order committing the defendant to a mental health center indicated that the defendant had exhibited delusions and extreme paranoia.

On February 14, 2006, the undersigned directed that defendant Thrasher be committed to a United States Medical Center for Federal Prisoners to undergo a psychiatric or psychological examination pursuant to 18 U.S.C. § 4241(b). An evaluation was conducted by the Federal Medical Center in Lexington, Kentucky, and their report was filed with the Court. In that report, Dr. Karen Milliner, the evaluating clinician, concluded that defendant Thrasher is not presently competent to stand trial as he is suffering from a mental disease or defect rendering him mentally incompetent to the extent he is unable to understand the nature and consequences of the proceedings against him or to properly assist in his defense.

A competency hearing was held before the undersigned on May 18, 2006. On June 7, 2006, United States District Judge Howard F. Sachs adopted the undersigned's Report and Recommendation and found defendant Thrasher not presently competent to stand trial. Defendant Thrasher was committed to the custody of the Attorney General pursuant to 18 U.S.C. § 4241(d)(1). The Attorney General was directed to hospitalize defendant Thrasher for treatment in a suitable facility for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future defendant Thrasher will attain the capacity to permit the trial to proceed.

---

4. While paternalistic appraisal may be out of bounds under Sell, it seems reasonably clear that the proposed efforts at medication to alleviate this defendant's mental condition are in the patient's best interest.

Defendant Thrasher arrived at the United States Medical Center for Federal Prisoners in Springfield, Missouri on June 23, 2006. By letter of August 23, 2006, Judge Sachs was advised by the Medical Center that defendant Thrasher required treatment with anti-psychotic medication to restore his competence to stand trial, but that defendant Thrasher refused to voluntarily accept such medication as a form of treatment.

On August 30, 2006, Judge Sachs met with government and defense counsel to obtain input on how to proceed. (Tr. of August 30, 2006 Proceedings at 5–6) Defense counsel requested an opportunity to go to Springfield and talk with defendant Thrasher about his options before any additional proceedings were scheduled. (*Id.* at 7) Defense counsel stated that he "may be able to set aside a great deal of work and time and expense for the court, for the government, for the defendant." (*Id.*) Defense counsel thought there was a possibility that defendant Thrasher would consent to the medication. (*Id.* at 8) Defense counsel advised that after he met with the defendant, he would contact the Court and government counsel. (*Id.*) Defense counsel acknowledged that if his client did not consent to the medication, the resolution of the medication issue could take a long time, and the timing issue would need to be part of the balance. (*Id.* at 10–11) Defense counsel noted that the time defendant spent at the Medical Center would be credited to his sentence. (*Id.* at 11)

Neither the Court nor government counsel was contacted by defense counsel as promised at the August 30 proceeding. On November 21, 2006, the undersigned held a status conference in this case. The parties agreed that a *Sell* hearing needed to be held. The parties were directed to contact the physicians who would testify at the hearing as to their availability.

On December 14, 2006, an evidentiary hearing was held in Springfield. The hearing was held pursuant to an oral motion by the Government to permit the involuntary medication of defendant Thrasher with anti-psychotic drugs in order to render him competent to stand trial. Defendant Thrasher was represented by Assistant Federal Public Defender Larry Pace. The Government was represented by Assistant United States Attorney Douglas Bunch. The Government called Dr. Lea Ann Davis–Preston, a staff psychologist, and Dr. Robert G. Sarrazin, the Chief of Psychiatry, at the United States Medical Center for Federal Prisoners in Springfield, Missouri, as witnesses.

The Government filed a Motion Memorializing Request for *Sell* Hearing to Determine Whether Medication May Be Involuntarily Administered to Defendant on January 8, 2007. Defendant filed a Response to Government's Motion Suggesting That the Defendant Be Involuntarily Medicated Pursuant to the *Sell* Guidelines on January 18, 2007.

## II. *FINDINGS OF FACT*

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. Defendant Thrasher was admitted to the Federal Medical Center in Springfield, Missouri, on June 23, 2006. (Tr.[1] at 6) He was assigned to Dr. Lea Ann Davis Preston's caseload. (Tr. at 6) Dr. Preston has worked with patients with competency restoration issues at the Federal Medical Center since 1997. (Tr. at 22) Dr. Preston is the primary clini-

---

1. "Tr." refers to the transcript of the hearing held on December 14, 2006.

cian responsible for coordinating defendant Thrasher's treatment and reevaluating his competency. (Tr. at 6–7) It took some time for defendant Thrasher to open up to Dr. Preston and tell her about his belief system. (Tr. at 28) Dr. Preston testified that when defendant Thrasher did open up to her, he told her that there was a group of people in the community who were monitoring him, bugging him, and trying to harm him, that they were trying to make him jealous so that he would act in a violent way, and that they communicated with him through his mind. (Tr. at 30–31, 33–34) Defendant Thrasher believes that these same people can influence the attorneys, the judges and what happens to him in court. (Tr. at 33) Defendant Thrasher believes these people are monitoring and controlling his case from afar. (Tr. at 33) Dr. Preston has interviewed defendant Thrasher in her office approximately six times since his admission. (Tr. at 32) Those interviews lasted anywhere from 20 to 45 minutes. (Tr. at 32–33) Dr. Preston's office is directly across from defendant Thrasher's housing unit, so in addition to the interviews, Dr. Preston has been able to observe Thrasher several times a week in his housing unit. (Tr. at 32–33) Dr. Robert G. Sarrazin has also participated in interviews of defendant Thrasher. (Tr. at 38)

2. Based on their observations and treatment of defendant Thrasher, Dr. Preston and Dr. Sarrazin both testified that defendant Thrasher is still suffering from a mental disease or defect that renders him mentally incompetent to understand the nature and consequences of the proceedings he is facing and to assist properly in his defense. (Tr. at 7, 39) However, in Dr. Preston's and Dr. Sarrazin's professional opinions, there is a plan of treatment that is substantially likely to render defendant Thrasher competent to stand trial. (Tr. at 7–8, 39) Dr. Preston testified that defendant Thrasher demonstrates prominent psychotic symptoms, i.e. auditory hallucinations and paranoid delusions. (Tr. at 7) Dr. Sarrazin testified that defendant Thrasher suffers from chronic paranoid schizophrenia, a psychotic disorder along with a delusional disorder. (Tr. at 38) According to Dr. Preston and Dr. Sarrazin, anti-psychotic medication is the accepted form of treatment for psychotic disorders and is very effective in alleviating symptoms such as hallucinations and delusions. (Tr. at 8, 39) The literature in the area indicates that with anti-psychotic medication, incompetent defendants are successfully restored to competency about 75 to 80 percent of the time. (Tr. at 14) About 75 to 80 percent of 4241(d) patients have been successfully restored to competency with medication within the Federal Bureau of Prisons system. (Tr. at 18) Dr. Preston testified that even the 20 to 25 percent who are not restored to competency usually demonstrate benefits from the medicine in that there is a reduction in their hallucinations and delusions. (Tr. at 18) Those who do not respond to treatment usually have a second condition, such as a brain injury or organic disorder, which defendant Thrasher does not have. (Tr. at 26, 35–36) Dr. Preston testified that from defendant Thrasher's available

records and from his self-report, Thrasher has been on anti-psychotic medication in the past and has responded very well. (Tr. at 8) When asked about medicine, defendant Thrasher told Dr. Preston that the medicine helped his mind and that he had not experienced any side effects. (Tr. at 35) Dr. Sarrazin testified that defendant Thrasher stated that Rispirdal actually seemed to help get rid of the pain in his head and that he experienced minimal or no side effects from it. (Tr. at 40) Past positive response to treatment is often an indication that a patient will often respond positively in the future. (Tr. at 18) Dr. Preston testified that she believes it is reasonable to expect that defendant Thrasher would have a similar positive response if the medication were initiated again. (Tr. at 19)

3. Anti-psychotic medications are typically separated into first generation and second generation medications. (Tr. at 14, 43) The first generation medications came out earlier. (Tr. at 14) They include medicines such as Thorazine, Haldol and Prolixin. (Tr. at 14) The second generation medications, often called atypical anti-psychotic medications, were more recently introduced to the market. (Tr. at 14–15) They include medicines such as Seroquel, Abilify, Geodon and Risperdal (a medication that defendant Thrasher has been prescribed in the past). (Tr. at 15) For the most part, both generations of medications are pretty equivalent in how effective they are in treating symptoms. (Tr. at 14, 43) The side effect profiles are a little different for the first generation and second generation medicines. (Tr. at 15)

4. Dr. Preston and Dr. Sarrazin both testified that treatment with anti-psychotic medication is substantially unlikely to produce side effects that would interfere significantly with defendant Thrasher's ability to assist counsel in conducting a defense at trial. (Tr. at 8, 47) Rather, the medication should help clear up defendant Thrasher's disorganized thinking. (Tr. at 48) The medication should also help defendant Thrasher be more receptive, more responsive and more able to relate to others, including his attorney. (Tr. at 49) The most common side effect that could interfere with a defendant's ability to attend trial and be competent would be lethargy or sedation. (Tr. at 8) Dr. Preston testified that this side effect is usually very easily treated by moving the medication to the evening so that it helps the patient sleep at night, but is not an issue during the day. (Tr. at 8) Dr. Preston further testified that if defendant Thrasher experienced side effects that were so severe that they interfered with his ability to assist counsel in conducting a defense, he would not be found competent. (Tr. at 8)

5. Patients taking first generation medications sometimes experience a side effect called acathisia which makes their feet feel restless and sometimes their muscles feel a little stiff. (Tr. at 17, 43) Side effect medications such as Artane, Cogentin and Benadryl can alleviate these symptoms. (Tr. at 17, 44) First generation medications as a class are more sedative than second generation medications. (Tr. at 44) Shifting dosages, splitting up dosages and giving all the medication at bedtime are strategies that can be used

to help with that particular side effect. (Tr. at 44) Tardive dyskinesia or involuntary movements, usually of the tongue and mouth, which can be permanent, are more common in the first generation medications when high dosages are taken for a longer period of time. (Tr. at 44) Second generation medications have fewer nuisance side effects than first generation medications. (Tr. at 17, 43) A small percentage of patients gain a large amount of weight and may have problems with their glucose levels when taking second generation medications. (Tr. at 23) Therefore, the medical staff monitors monthly a patient's blood levels for glucose and cholesterol when the patient is taking a second generation medication. (Tr. at 23) If the patient shows elevated blood sugars, the medication is changed. (Tr. at 23) Dr. Preston testified that the most serious side effect of all the anti-psychotic medications is a condition called neuroleptic malignant syndrome. (Tr. at 23) Patients who experience neuroleptic malignant syndrome have a very high temperature, marked stiffness, rigidity, muscle wasting and muscle damage that can then lead to kidney damage. (Tr. at 44) The symptoms can be eased by stopping the medication, supporting someone with IV fluids and hospitalization in a medical facility. (Tr. at 44) This condition is uncommon with the first generation medications and even more uncommon with the second generation medications. (Tr. at 45) Dr. Preston has not had any patients who have developed this condition. (Tr. at 23)

6. Dr. Sarrazin stressed that second generation anti-psychotic medications are started out in the community all the time in office settings. (Tr. at 55) These medications are out-patient medications. (Tr. at 56) They are used by millions of individuals throughout the United States. (Tr. at 56) Dr. Sarrazin further stressed that with psychiatric illnesses, there are no x-rays or laboratory tests where the doctor can say the patient has this much schizophrenia which will respond to two milligrams of Risperdal after four weeks of treatment. (Tr. at 56) Psychiatrists cannot take a sample from the patient and grow it out to see what type of bacteria is present and the exact type and amount of medication needed. (Tr. at 56)

7. Dr. Preston testified that she has discussed treatment with anti-psychotic medication on several different occasions with defendant Thrasher, but Thrasher has indicated that he is unwilling to resume taking medication. (Tr. at 8–9) Defense counsel has advised Dr. Preston that defendant Thrasher is concerned about receiving medicine from people who work for the government because he feels that would not be safe since the government is prosecuting him. (Tr. at 35) Dr. Preston and Dr. Sarrazin both testified that they are aware of no other viable alternatives to compel defendant Thrasher to engage in the treatment plan recommended other than involuntary medication. (Tr. at 9, 53) In Dr. Preston's experience, a court order that a defendant will be held in contempt if he refuses to take medication has not been effective with incompetent defendants. (Tr. at 10) Incompetent defendants do not have good insight into the fact that they have an illness. (Tr.

at 10) Incompetent defendants do not believe they need medicine and are not competent to make good decisions about their own care. (Tr. at 10) Based on her observations and treatment of defendant Thrasher, Dr. Preston testified that she believed Thrasher would continue to refuse to take the medication even if ordered to do so by the court. (Tr. at 10) Dr. Sarrazin testified that defendant Thrasher is not of the opinion that he has a mental illness. (Tr. at 53) Defendant Thrasher is of the opinion that the staff at the Federal Medical Center, the government, the judges and the court are all part of the conspiracy against him. (Tr. at 53) Therefore, Dr. Sarrazin testified that he does not believe an order of the court directing defendant Thrasher to take medication would have any impact on Thrasher. (Tr. at 53)

8. In Dr. Preston's and Dr. Sarrazin's professional judgment, there are no treatments that would be less intrusive than involuntary administration of anti-psychotic medication that are likely to achieve substantially the same results as treatment with anti-psychotic medication. (Tr. at 9, 52) Dr. Preston and Dr. Sarrazin believe that anti-psychotic medication is the only treatment that will restore defendant Thrasher to competency. (Tr. at 29, 52) Dr. Preston testified that defendant Thrasher is attending a competency restoration group at the Federal Medical Center. (Tr. at 9) The group, which meets weekly, is a one-hour didactic that educates patients regarding the legal system and how it works. (Tr. at 9, 28–29) Dr. Preston testified that while defendant Thrasher has a good factual understanding of the

legal system, his delusional beliefs and hallucinations impact his rational appreciation of his circumstances and impact his ability to assist in his own defense. (Tr. at 9) Dr. Preston did not offer defendant Thrasher individual psychotherapy because she did not believe it would be effective nor did she think Thrasher would have wanted to participate in it. (Tr. at 29) According to Dr. Preston, psychotherapy and group treatment are not effective in treating the type of symptoms defendant Thrasher exhibits. (Tr. at 9) The primary treatment that would address defendant Thrasher's symptoms is medication. (Tr. at 9)

9. Dr. Preston testified that based upon her conversations with defendant Thrasher, she does not believe that he is competent to refuse treatment. (Tr. at 10–11) The reason that defendant Thrasher is refusing treatment is that he lacks insight into his own illness. (Tr. 11) Defendant Thrasher believes that people are trying to harm him. (Tr. at 11) Dr. Sarrazin also testified that defendant Thrasher is currently not competent to refuse anti-psychotic medications because of his delusional system and the fact that he does not believe he has an illness. (Tr. at 53–54)

10. Dr. Preston testified that the medically appropriate treatment for defendant Thrasher's diagnosis, i.e. schizophrenia, is anti-psychotic medication. (Tr. at 11) The plan of treatment that is medically appropriate and in defendant Thrasher's best interest in light of his mental condition is the same plan of treatment that is appropriate to restore Thrasher to competency to stand

trial. (Tr. at 11) Dr. Sarrazin testified that the proposed treatment plan with anti-psychotic medications is medically appropriate for defendant Thrasher and is in Thrasher's best medical interest in light of his medical condition. (Tr. at 51) Dr. Sarrazin testified this is true independently and separate and apart from the goal of restoring defendant Thrasher to competency to stand trial. (Tr. at 52) Dr. Sarrazin testified that he would recommend the same treatment plan if defendant Thrasher were his patient outside of the current setting. (Tr. at 54)

11. Dr. Preston testified that, if the Court authorized involuntary medication, she and Dr. Sarrazin would sit down with defendant Thrasher and talk about medications that Thrasher has taken in the past. (Tr. at 15) The doctors would attempt to elicit defendant Thrasher's cooperation by taking into account Thrasher's preferences as to which medication he would be most willing to take. (Tr. at 15–16) If defendant Thrasher did not have a preference, Dr. Preston testified that Dr. Sarrazin typically goes with one of the second generation medications that the records have shown to be effective. (Tr. at 16) Since Dr. Milliner's report shows that defendant Thrasher has responded positively to Risperdal or Rispirodone, Dr. Sarrazin would probably suggest that medicine. (Tr. at 16) That medicine comes in an oral form. (Tr. at 16) If defendant Thrasher was willing to take that medicine orally, they would proceed from there. (Tr. at 16) Dr. Sarrazin testified that he would begin with a low dosage and then move the dose up until it was at a therapeutic level. (Tr. at 40) This process would take approximately two weeks. (Tr. at 68) Provided that the medication was being tolerated without difficulty, Dr. Sarrazin testified that he would continue defendant Thrasher on the medication for six to eight weeks, possibly a littler longer, to make sure they had a good trial of the medication at a good dose for a good period of time and then see if the medication was helpful in alleviating Thrasher's symptoms so that he could become competent and proceed to trial. (Tr. at 41) If at any time, defendant Thrasher was unable to tolerate the medication or if the side effects were significant, Dr. Sarrazin testified that he would change to a different second generation anti-psychotic medication, such as Abilify, Geodon, Zyprexa, Seroquel and then Clazoil. (Tr. at 41)

12. If defendant Thrasher was unwilling to comply with oral medication, Dr. Sarrazin would probably look at one of the first generation medications such as Haldol or Haloperadol because they have an injectable form as a backup. (Tr. at 16, 41) Defendant Thrasher would be given the option of receiving Haldol in an oral form. (Tr. at 16) If he refused, the nurses would administer the medicine by injection. (Tr. at 16) The injectable form comes in a short-acting medicine as well as a long-acting medicine. (Tr. at 16) If a patient refuses to comply with medicine for a few days in a row, Dr. Sarrazin typically changes to the long-acting form so that the injections are not as frequently re-

quired. (Tr. at 16) An injectable of Haldol would only require an injection every two, three or four weeks. (Tr. at 43) As a patient starts to improve, the doctors attempt to elicit the patient's cooperation in taking oral medicine. (Tr. at 16–17) Often, a patient's mental state has improved sufficiently on the Haldol so that the doctors are then able to start the patient on a second generation medication that may have fewer side effects. (Tr. at 17)

13. Dr. Sarrazin testified that defendant Thrasher would be given his medication to begin with during the daylight hours when there are more staff on duty. (Tr. at 45) That schedule would continue for a period of time to see if defendant Thrasher had any severe stiffness that occurred or any other significant reaction to the medication. (Tr. at 45) If defendant Thrasher complained of sedation at that point in time, the medication could be administered at bedtime so that it was less problematic. (Tr. at 45) Nursing staff are present 24 hours a day. (Tr. at 45) Officers are also present and have contact with the patient/inmates. (Tr. at 45) If a patient/inmate exhibits a significant or even minor change, the officers are often the first ones to point it out because they are with the patient/inmates for eight-hour shifts day in and day out. (Tr. at 45–46) Defendant Thrasher would obtain the medication each day from a nurse, so the staff would be able to monitor how much medication Thrasher was getting, make sure he was taking the medication and see how he was doing at the time. (Tr. at 46)

14. In Dr. Preston's opinion, defendant Thrasher has not shown any indication that he is a threat to himself or others in his current institutional setting. (Tr. at 12) Dr. Preston further testified that, at the present time, defendant Thrasher's mental disease or defect does not, in her opinion, put his health gravely at risk. (Tr. at 12) Dr. Preston has not evaluated defendant Thrasher for purposes of 18 U.S.C. § 4246, that is whether he is dangerous due to mental illness. (Tr. at 12)

## III. *DISCUSSION*

Two issues are presently before the Court. First, defendant argues that the case against him should be dismissed as he is still incompetent to proceed and the time authorized for making him competent has expired. Second, if the continued hospitalization of defendant is authorized, the issue before the Court is whether defendant should be administered psychiatric medications pursuant to *Sell v. United States,* 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003).

### A. *Time Period of Hospitalization*

Section 4241(d) provides:

(d) **Determination and disposition.**—If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General. The Attorney

General shall hospitalize the defendant for treatment in a suitable facility—

(1) for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the trial to proceed; and

for an additional reasonable period of time until—

(A) his mental condition is so improved that trial may proceed, if the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the trial to proceed; or

the pending charges against him are disposed of according to law;

whichever is earlier.

If, at the end of the time period specified, it is determined that the defendant's mental condition has not so improved as to permit the trial to proceed, the defendant is subject to the provisions of section 4246.[2]

18 U.S.C. § 4241(d).

On June 7, 2006, United States District Judge Sachs ordered that defendant Thrasher be committed to the custody of the Attorney General pursuant to 18 U.S.C. § 4241(d)(1). Defendant Thrasher arrived at the United States Medical Center for Federal Prisoners in Springfield, Missouri on June 23, 2006. On August 23, 2006 (two months after arriving at the Medical Center), the Court was advised by the Medical Center that defendant Thrasher required treatment with anti-psychotic medication to restore his competence to stand trial, but that defendant Thrasher refused to voluntarily accept such medication as a form of treatment. At a conference held on August 30, 2006, defense counsel advised the Court and government counsel that he wanted an opportunity to talk with defendant Thrasher about his options before any additional proceedings were scheduled. Defense counsel advised that after he met with the defendant, he would contact the Court and government counsel. Neither the Court nor government counsel was contacted by defense counsel. Pursuant to a status conference held on November 21, 2006, the parties decided to proceed with a *Sell* hearing.

It appears that the Government has complied with the provisions of section 4241(d)(1). A determination was made at the Medical Center within the appropriate period of time that there was a substantial probability that in the foreseeable future defendant Thrasher would attain the capacity to permit the trial to proceed if he were treated with anti-psychotic medication. The delay in resolving the issue appears to be as a result of defense counsel's request that he be given an opportunity to attempt to work it out with defendant.[3]

At the hearing held on December 14, 2006, government counsel orally requested an additional reasonable period of time under section 4241(d)(2) to permit the defendant to become competent to stand trial. (Tr. at 3) Defendant Thrasher's hospitalization is now proceeding under section 4241(d)(2). Pursuant to section 4241(d)(2), the Court must find whether there is a

---

**2.** Section 4246 authorizes the continued hospitalization of a defendant suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another.

**3.** Even if, as defendant argues, the time authorized for making him competent had expired, the remedy would not be dismissal of the case. Rather, defendant would be subject to the provisions of section 4246. *See* 18 U.S.C. § 4241(d).

substantial probability that within an additional reasonable period of time defendant Thrasher will attain the capacity to permit the trial to proceed. As discussed below with respect to the issue of the involuntary medication of defendant, the Court finds there is a substantial probability that within an additional reasonable period of time defendant Thrasher will attain the capacity to permit the trial to proceed. Defendant Thrasher's continued hospitalization is thereby authorized.

### B. *Involuntary Medication of Defendant*

■■ In *Sell v. United States,* 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003), the Supreme Court found that before a court analyzes whether a defendant may be involuntarily medicated for the purpose of rendering him competent to stand trial, the court should examine whether involuntary medication can be justified on an alternative ground:

> A court need not consider whether to allow forced medication for [the purpose of rendering a defendant competent to stand trial], if forced medication is warranted for a *different* purpose, such as ... purposes ... related to the individual's dangerousness, or purposes related to the individual's own interests where refusal to take drugs puts his health gravely at risk.... There are often strong reasons for a court to determine whether forced administration of drugs can be justified on these alternative grounds *before* turning to the trial competence question.

*Id.* at 181–82, 123 S.Ct. 2174. If an alternative grounds is not available, the Court set forth strict criteria that must be met before a court can approve the involuntary medication of a defendant for the purpose of rendering him competent to stand trial. The Court stated:

the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests.

*Id.* at 179, 123 S.Ct. 2174. The Court expanded on the four factors to be addressed in determining whether a defendant may be involuntarily medicated solely for trial competence purposes:

> First, a court must find that *important* governmental interests are at stake. The Government's interest in bringing to trial an individual accused of a serious crime is important....

> Second, the court must conclude that involuntary medication will *significantly further* those concomitant state interests. It must find that administration of the drugs is substantially likely to render the defendant competent to stand trial. At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair....

> Third, the court must conclude that involuntary medication is *necessary* to further those interests. The court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results.... And the court must consider less intrusive means for administering the drugs, e.g., a court order to the defendant backed by the

contempt power, before considering more intrusive methods.

Fourth, ... the court must conclude that administration of the drugs is *medically appropriate, i.e.,* in the patient's best medical interest in light of his medical condition. The specific kinds of drugs at issue may matter here as elsewhere. Different kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success. *Sell,* 539 U.S. at 180–81, 123 S.Ct. 2174 (emphasis in original).

In the case currently before the Court, alternative grounds for involuntary medication do not appear to be present. As Dr. Preston testified, defendant Thrasher has not shown any indication that he is a threat to himself or others in his current institutional setting. (*See* Fact No. 14, *supra*) Further, Dr. Preston testified that defendant Thrasher's mental disease or defect does not put his health gravely at risk at the present time. (*Id.*) Thus, the Court will examine whether defendant may be involuntarily medicated for the purpose of rendering him competent to stand trial. As set forth below, the Court finds that the Government has met its burden on each of the four **Sell** factors.

### 1. *Important Governmental Interests are at Stake*

■ Government counsel set forth the following to show that important governmental interests are at stake in bringing defendant to trial:

Here, the government clearly has a compelling interest in bringing defendant to trial to bring him to justice and protect society. Defendant is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2). Defendant suffers from paranoid schizophrenia and unless medicated, experiences delusions and extreme paranoia. At the time of his arrest in the instant case, defendant had stopped taking his medication and had begun to have homicidal thoughts. A family member reported that defendant believed that police were tampering with his rifle sights. While sighting his rifles, defendant "... became irate and started saying the cops can't take his guns and if they try to take them he's going to kill them." When defendant left his residence with his rifle, another family member was so concerned that she called the Henry County Sheriff's Office to report that defendant had a gun, was a felon, and threatened to kill a cop. During the instant arrest encounter, defendant spontaneously expressed his belief that he had been set up and that it was enough to make him want to shoot someone. These facts demonstrate that defendant had access to guns and was prepared to kill police officers or anyone he mistakenly though was a police officer thereby exposing the police and the public to a serious threat of harm.

In determining whether a crime is "serious" for involuntary medication purposes, it is appropriate to focus on the maximum penalty authorized by statute.... Here, defendant is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2), which carries a maximum term of imprisonment of ten years....

(Government's Motion Memorializing Request for *Sell* Hearing to Determine Whether Medication May Be Involuntarily Administered to Defendant at 5–6)(footnotes omitted)

Defendant responds that the Government has not demonstrated an important governmental interest for involuntary medication. Defendant contends that his

sentencing guideline range is 27 to 33 months and that he has already served a year in federal custody. (Response to Government's Motion Suggesting That the Defendant Be Involuntarily Medicated Pursuant to the *Sell* Guidelines at 3) Defendant argues that he will have served all his time before this case makes it through the District Court and appellate process. (*Id.*)

As set forth in *United States v. Evans*, 404 F.3d 227, 237 (4th Cir.2005), "it is appropriate to focus on the maximum penalty authorized by statute in determine if a crime is 'serious' for involuntary medication purposes." The court rejected the defendant's argument that the analysis should focus on the sentence he was most likely to receive under the sentencing guidelines:

> Such a focus ... would simply be unworkable because at this stage in the proceedings, there is no way of accurately predicting what that range will be. The final guideline range is computed only after the district court makes findings of fact relevant to sentencing categories. These factual findings are based on the Presentence Report (PSR), which the Probation Office prepares pursuant to testimony presented at trial or the plea and a detailed investigation of the defendant. A focus on the probable guideline range as the barometer of seriousness would shift this fact-finding to a time before the defendant's trial or plea, before the Probation Office prepares its report, and at a time when the district

court has already ruled that the defendant himself is incompetent. Fact-finding under these circumstances—with no PSR and with the defendant unable to testify or render other assistance to counsel—would be uniquely inappropriate.

*Id.* at 238. The court further found that after the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and the consequent inability to predict a defendant's actual sentence based on his probable guideline range, the defendant's suggestion that the court determine seriousness by examining his probable guideline range was even more unworkable. *Evans*, 404 F.3d at 238 n. 7.

The *Evans* court concluded that a charge carrying a maximum term of imprisonment of ten years should be considered "serious" under any reasonable standard. 404 F.3d at 238. Like the *Evans* court, this Court believes "it beyond dispute that the Government does have an important interest in trying a defendant charged with a felony carrying a maximum punishment of 10 years imprisonment." *Id.*

Even if the Court concludes that defendant Thrasher is facing a serious charge, the Supreme Court noted in *Sell* that the government's important interest in prosecuting the defendant on serious charges can be lessened under special circumstances.[4] *See Sell v. U.S.*, 539 U.S. 166, 180, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003). Defendant argues that the year he has already served in federal custody less-

---

**4.** The Sell court offered two examples of special circumstances that may lessen the importance of the Government's interest in prosecution:

> The defendant's failure to take drugs voluntarily, for example, may mean lengthy confinement in an institution for the mentally ill-and that would diminish the risks that ordinarily attach to freeing without punish-

ment one who has committed a serious crime.... The same is true of the possibility that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed ...).

*Sell v. U.S.*, 539 U.S. 166, 180, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003).

ens the government's interest in prosecuting him. However, even if credited for the year already served, defendant Thrasher is still facing almost nine years in prison on the felony charge against him. Under any reasonable standard, the Government has an important interest in trying a defendant who is charged with a crime that has the potential of an almost nine-year prison term. *See United States v. Evans,* 404 F.3d 227, 239 (4th Cir.2005). Defendant Thrasher's past detention does not render unimportant the Government's interest in prosecuting him.

Likewise, the possibility of civil commitment does not render unimportant the Government's interest in prosecuting defendant Thrasher. The federal civil commitment statute requires a showing that the patient presents "a substantial risk of bodily injury to another person or serious damage to property of another." 18 U.S.C. § 4246(a). While Dr. Preston has opined that defendant Thrasher has not shown any indication that he is a threat to himself or others in his current institutional setting, she has not evaluated defendant Thrasher for purposes of 18 U.S.C. § 4246. (*See* Fact No. 14, *supra* ) The record does not presently support an argument that defendant Thrasher would be a candidate for civil commitment, thus rendering unimportant the Government's interest in prosecuting him.

The Court can identify no other special circumstances tending to diminish the importance of the Government's interest in restoring defendant Thrasher to competence so that he may face trial. Therefore, the Court finds that important governmental interests are at stake in restoring defendant Thrasher to competency.

### 2. *Medication is Substantially Likely to Render Defendant Competent*

Dr. Preston and Dr. Sarrazin set forth the following treatment plan that they would administer if directed by the Court to involuntarily medicate defendant Thrasher:

Dr. Preston testified that, if the Court authorized involuntary medication, she and Dr. Sarrazin would sit down with defendant Thrasher and talk about medications that Thrasher has taken in the past. The doctors would attempt to elicit defendant Thrasher's cooperation by taking into account Thrasher's preferences as to which medication he would be most willing to take. If defendant Thrasher did not have a preference, Dr. Preston testified that Dr. Sarrazin typically goes with one of the second generation medications that the records have shown to be effective. Since Dr. Milliner's report shows that defendant Thrasher has responded positively to Risperdal or Rispirodone, Dr. Sarrazin would probably suggest that medicine. That medicine comes in an oral form. If defendant Thrasher was willing to take that medicine orally, they would proceed from there. Dr. Sarrazin testified that he would begin with a low dosage and then move the dose up until it was at a therapeutic level. This process would take approximately two weeks. Provided that the medication was being tolerated without difficulty, Dr. Sarrazin testified that he would continue defendant Thrasher on the medication for six to eight weeks, possibly a littler longer, to make sure they had a good trial of the medication at a good dose for a good period of time and then see if the medication was helpful in alleviating Thrasher's symptoms so that he could become competent and proceed to trial. If at any time, defendant Thrasher was unable to tolerate the medication or if the side effects were significant, Dr. Sarrazin testified that he would change to a different second generation anti-psy-

chotic medication, such as Abilify, Geodon, Zyprexa, Seroquel and then Clazoil. (*See* Fact No. 11, *supra*)

If defendant Thrasher was unwilling to comply with oral medication, Dr. Sarrazin would probably look at one of the first generation medications such as Haldol or Haloperadol because they have an injectable form as a backup. Defendant Thrasher would be given the option of receiving Haldol in an oral form. If he refused, the nurses would administer the medicine by injection. The injectable form comes in a short-acting medicine as well as a long-acting medicine. If a patient refuses to comply with medicine for a few days in a row, Dr. Sarrazin typically changes to the long-acting form so that the injections are not as frequently required. An injectable of Haldol would only require an injection every two, three or four weeks. As a patient starts to improve, the doctors attempt to elicit the patient's cooperation in taking oral medicine. Often, a patient's mental state has improved sufficiently on the Haldol so that the doctors are then able to start the patient on a second generation medication that may have fewer side effects. (*See* Fact No. 12, *supra*)

Dr. Sarrazin testified that defendant Thrasher would be given his medication to begin with during the daylight hours when there are more staff on duty. That schedule would continue for a period of time to see if defendant Thrasher had any severe stiffness that occurred or any other significant reaction to the medication. If defendant Thrasher complained of sedation at that point in time, the medication could be administered at bedtime so that it was less problematic. Nursing staff are present 24 hours a day. Officers are also present and have contact with the patient/inmates. If a patient/inmate exhibits a significant or even minor change, the officers are often the first ones to point it out because they are with the patient/inmates for eight-hour shifts day in and day out. Defendant Thrasher would obtain the medication each day from a nurse, so the staff would be able to monitor how much medication Thrasher was getting, make sure he was taking the medication and see how he was doing at the time. (*See* Fact No. 13, *supra*)

As set forth above, in order to satisfy the second Sell factor, the Court must find:

that administration of the drugs is substantially likely to render the defendant competent to stand trial. At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair.

*Sell v. U.S.*, 539 U.S. 166, 181, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003).

■ Dr. Preston and Dr. Sarrazin provided the following testimony to support a finding that the administration of a drug treatment plan is substantially likely to render defendant Thrasher competent to stand trial and substantially unlikely to have side effects that will interfere significantly with his ability to assist counsel in conducting a trial defense:

In Dr. Preston's and Dr. Sarrazin's professional opinions, there is a plan of treatment that is substantially likely to render defendant Thrasher competent to stand trial. (*See* Fact No. 2, *supra*)

Dr. Preston testified that defendant Thrasher demonstrates prominent psychotic symptoms, i.e. auditory hallucinations and paranoid delusions. Dr. Sarrazin testified that defendant Thrasher suffers from chronic paranoid schizophrenia, a psychotic disorder along with

a delusional disorder. According to Dr. Preston and Dr. Sarrazin, anti-psychotic medication is the accepted form of treatment for psychotic disorders and is very effective in alleviating symptoms such as hallucinations and delusions. (*Id.*)

The literature in the area indicates that with anti-psychotic medication, incompetent defendants are successfully restored to competency about 75 to 80 percent of the time. About 75 to 80 percent of 4241(d) patients have been successfully restored to competency with medication within the Federal Bureau of Prisons system. (*Id.*)

Dr. Preston testified that from defendant Thrasher's available records and from his self-report, Thrasher has been on anti-psychotic medication in the past and has responded very well. When asked about medicine, defendant Thrasher told Dr. Preston that the medicine helped his mind and that he had not experienced any side effects. Dr. Sarrazin testified that defendant Thrasher stated that Rispirdal actually seemed to help get rid of the pain in his head and that he experienced minimal or no side effects from it. (*Id.*)

Past positive response to treatment is often an indication that a patient will often respond positively in the future. Dr. Preston testified that she believes it is reasonable to expect that defendant Thrasher would have a similar positive response if the medication were initiated again. (*Id.*)

Dr. Preston and Dr. Sarrazin both testified that treatment with anti-psychotic medication is substantially unlikely to produce side effects that would interfere significantly with defendant Thrasher's ability to assist counsel in conducting a defense at trial. Rather, the medication should help clear up defendant Thrasher's disorganized thinking. The medi-

cation should also help defendant Thrasher be more receptive, more responsive and more able to relate to others, including his attorney. (*See* Fact No. 4, *supra*)

The most common side effect that could interfere with a defendant's ability to attend trial and be competent would be lethargy or sedation. Dr. Preston testified that this side effect is usually very easily treated by moving the medication to the evening so that it helps the patient sleep at night, but is not an issue during the day. (*Id.*)

Defendant Thrasher contends that because Dr. Preston and Dr. Sarrazin could present no history on how therapeutic doses of any particular drug would affect him, the Government has failed to meet the burden of proof on likelihood to render the defendant competent and unlikely to have adverse side effects. (Response to Government's Motion Suggesting That the Defendant Be Involuntarily Medicated Pursuant to the *Sell* Guidelines at 3) Defendant presented no case law to support such a stringent standard.

From a review of all the materials submitted in this case, the Court finds that the medication proposed by Dr. Preston and Dr. Sarrazin is substantially likely to render defendant Thrasher competent to stand trial and substantially unlikely to have side effects that will interfere significantly with defendant's ability to assist counsel in conducting a trial defense.

3. *Involuntary Medication is Necessary to Render Defendant Competent*

In order to satisfy the third *Sell* factor, the Court must find:

that involuntary medication is *necessary* to further [the Government's interest in bringing defendant to trial]. The court must find that any alternative, less in-

trusive treatments are unlikely to achieve substantially the same results.... And the court must consider less intrusive means for administering the drugs, e.g., a court order to the defendant backed by the contempt power, before considering more intrusive methods.

*Sell v. U.S.*, 539 U.S. 166, 181, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003).

■ Dr. Preston and Dr. Sarrazin provided the following testimony to support a finding that involuntary medication of defendant Thrasher is necessary to restore his competence and that there are no alternative, less intrusive treatments that are likely to achieve the same results:

Dr. Preston testified that she has discussed treatment with anti-psychotic medication on several different occasions with defendant Thrasher, but Thrasher has indicated that he is unwilling to resume taking medication. Defense counsel has advised Dr. Preston that defendant Thrasher is concerned about receiving medicine from people who work for the government because he feels that would not be safe since the government is prosecuting him. Dr. Preston and Dr. Sarrazin both testified that they are aware of no other viable alternatives to compel defendant Thrasher to engage in the treatment plan recommended other than involuntary medication. In Dr. Preston's experience, a court order that a defendant will be held in contempt if he refuses to take medication has not been effective with incompetent defendants. Incompetent defendants do not have good insight into the fact that they have an illness. Based on her observations and treatment of defendant Thrasher, Dr. Preston testified that she believed Thrasher would continue to refuse to take the medication even if ordered to do so by the court. (*See* Fact No. 7, *supra* )

Dr. Sarrazin testified that defendant Thrasher is not of the opinion that he has a mental illness. Defendant Thrasher is of the opinion that the staff at the Federal Medical Center, the government, the judges and the court are all part of the conspiracy against him. Therefore, Dr. Sarrazin testified that he does not believe an order of the court directing defendant Thrasher to take medication would have any impact on Thrasher. (*Id.*)

In Dr. Preston's and Dr. Sarrazin's professional judgment, there are no treatments that would be less intrusive than involuntary administration of anti-psychotic medication that are likely to achieve substantially the same results as treatment with anti-psychotic medication. Dr. Preston and Dr. Sarrazin believe that anti-psychotic medication is the only treatment that will restore defendant Thrasher to competency. (*See* Fact No. 8, *supra* )

Dr. Preston testified that defendant Thrasher is attending a competency restoration group at the Federal Medical Center. The group, which meets weekly, is a one-hour didactic that educates patients regarding the legal system and how it works. Dr. Preston testified that while defendant Thrasher has a good factual understanding of the legal system, his delusional beliefs and hallucinations impact his rational appreciation of his circumstances and impact his ability to assist in his own defense. Dr. Preston did not offer defendant Thrasher individual psychotherapy because she did not believe it would be effective nor did she think Thrasher would have wanted to participate in it. According to Dr. Preston, psychotherapy and group treatment are not effective in treating the type of symptoms defendant

Thrasher exhibits. The primary treatment that would address defendant Thrasher's symptoms is medication. (*Id.*)

Defendant Thrasher argues that because he has not yet been ordered to submit to medication or face contempt of court, the doctors have no basis for concluding that an order of court would have no impact on him. (Response to Government's Motion Suggesting That the Defendant Be Involuntarily Medicated Pursuant to the *Sell* Guidelines at 4) Again, defendant presented no case law to support his argument. The Sell court directed that courts consider less intrusive means for administering the drugs such as a court order to the defendant backed by the contempt power. The Court has considered this option, but given the professional opinions of Dr. Preston and Dr. Sarrazin, it appears that such an approach would only act to further delay this case.

From a review of all the materials submitted in this case, the Court finds that anti-psychotic medication is necessary to restore defendant Thrasher to competency. There do not appear to be any treatments that would be less intrusive than the involuntary administration of anti-psychotic medication that are likely to achieve substantially the same results as treatment with anti-psychotic medication.

#### 4. *The Proposed Medication is Medically Appropriate*

■ In order to satisfy the fourth Sell factor, "the Court must conclude that administration of the drugs is *medically appropriate, i.e.,* in the patient's best medical interest in light of his medical condition." *Sell v. U.S.,* 539 U.S. 166, 181, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003).

Dr. Preston and Dr. Sarrazin provided the following testimony to support a finding that involuntary medication of defendant Thrasher is in his best medical interest:

Dr. Preston testified that the medically appropriate treatment for defendant Thrasher's diagnosis, i.e. schizophrenia, is anti-psychotic medication. The plan of treatment that is medically appropriate and in defendant Thrasher's best interest in light of his mental condition is the same plan of treatment that is appropriate to restore Thrasher to competency to stand trial. (*See* Fact No. 10, *supra* )

Dr. Sarrazin testified that the proposed treatment plan with anti-psychotic medications is medically appropriate for defendant Thrasher and is in Thrasher's best medical interest in light of his medical condition. Dr. Sarrazin testified this is true independently and separate and apart from the goal of restoring defendant Thrasher to competency to stand trial. Dr. Sarrazin testified that he would recommend the same treatment plan if defendant Thrasher were his patient outside of the current setting. (*Id.*)

Defendant Thrasher argues that the doctors do not have a definite treatment plan for him and that they are merely relying on what has been effective for others. (Response to Government's Motion Suggesting That the Defendant Be Involuntarily Medicated Pursuant to the *Sell* Guidelines at 5–7)

■ As set out above, Dr. Preston and Dr. Sarrazin have provided the Court with a detailed treatment plan for defendant Thrasher. The fact that the doctors have testified that the plan may be modified if defendant Thrasher is unable to tolerate the medication or if the side effects are significant, does not, in this Court's opinion, detract from the appropriateness of the plan. Rather, it makes the plan more

practical and useful. The Court is not an expert in the field of psychiatry. It must rely on the expertise of the medical staff. If the Court were to require that the doctors provide a treatment plan set in stone and then require that the doctors obtain the Court's permission before making any changes that the doctors determined were necessary, there would be resulting delays that might adversely affect defendant Thrasher.

Defendant Thrasher has previously received the same or similar medications with positive results and without serious side effects. As stated by the court in *United States v. Bethea*, 2006 WL 1313977, *6 (E.D.Mo. May 11, 2006), "[a]lthough there is some risk of serious side effects, the risk is slight and can be minimized through the type of careful monitoring available at the Medical Center." From a review of all the materials submitted in this case, including the benefits and risks associated with various anti-psychotic medications, the Court finds that the treatment plan proposed by Dr. Preston and Dr. Sarrazin is medically appropriate.

## IV. *CONCLUSION*

For the reasons set forth above, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order granting the Government's Motion Memorializing Request for *Sell* Hearing to Determine Whether Medication May Be Involuntarily Administered to Defendant (doc # 47). It is further

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order directing the United States Medical Center for Federal Prisoners in Springfield, Missouri, to commence the involuntary medication of defendant Thrasher in order to render him competent to stand trial.

Counsel are reminded they have ten days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.